RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2001 FED App. 0023P (6th Cir.)
File Name: 01a0023p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

JAMES DOAN,
     *Petitioner-Appellant,*

     *v.*

ANTHONY J. BRIGANO,
     *Respondent-Appellee.*

No. 98-4243

Appeal from the United States District Court
for the Southern District of Ohio at Cincinnati.
No. 97-00825—Susan J. Dlott, District Judge.

Argued: October 27, 2000

Decided and Filed: January 19, 2001

Before: SUHRHEINRICH and MOORE, Circuit Judges;
EDMUNDS, District Judge.[*]

---

**COUNSEL**

**ARGUED:** Teresa L. Cunningham, Florence, Kentucky, for Appellant. Katherine E. Pridemore, ASSISTANT OHIO ATTORNEY GENERAL, CORRECTIONS LITIGATION

---

[*] The Honorable Nancy G. Edmunds, United States District Judge for the Eastern District of Michigan, sitting by designation.

1

SECTION, Cincinnati, Ohio, for Appellee. **ON BRIEF:** Teresa L. Cunningham, Florence, Kentucky, for Appellant. Katherine E. Pridemore, ASSISTANT OHIO ATTORNEY GENERAL, CORRECTIONS LITIGATION SECTION, Cincinnati, Ohio, for Appellee.

MOORE, J., delivered the opinion of the court, in which EDMUNDS, D. J., joined. SUHRHEINRICH, J. (pp. 30-33), delivered a separate opinion concurring in the result.

---

**OPINION**

---

KAREN NELSON MOORE, Circuit Judge. Petitioner-Appellant James Doan, an Ohio prisoner convicted of murder and child endangerment, appeals the district court's denial of his petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Doan raised several claims in his habeas petition, alleging both juror and prosecutorial misconduct as well as errors by the trial court in jury instructions, sentencing, and failing to grant continuances to the defense so as to retain an expert witness. The district court held that Doan had procedurally defaulted all of his claims except for certain allegations of juror misconduct, and further held that it was barred from reviewing the remaining misconduct claim because the state court's judgment disposing of the claim rested on Ohio Evid. R. 606(B), an adequate and independent state ground. As part of its order denying Doan's habeas petition, the district court granted a certificate of appealability with respect to one issue: "whether the State courts' application of Ohio R. Evid. 606(B) in this case deprived petitioner of a fair trial[.]" Joint Appendix ("J.A.") at 134 (D. Ct. Order Den. Habeas). This court will limit its review to that question. For the reasons set forth below, we hold that, while the application of Ohio Evid. R. 606(B) violated Doan's Sixth Amendment right to confront the evidence and the witnesses presented against him, as well as his right to a jury that considers only the evidence presented at trial, an exhaustive review of the trial record conclusively shows that

Doan was not prejudiced by this constitutional error. Thus, we **AFFIRM** the district court's denial of Doan's habeas petition, but on grounds different from those on which the district court relied.

## I. BACKGROUND

James Doan first met his girlfriend, Catherine Beisel, early in 1993. Approximately two months later, Doan moved in with Beisel and her two children. Over the course of the five months in which Doan resided with Beisel, he regularly babysat for her children in the evenings while she was at work. Beisel worked as a bartender and generally did not arrive home until after 3:00 a.m.

Beisel's youngest child, fifteen-month-old Star Hollingsworth, had been severely injured several times during the months in which Doan lived with Beisel and her children. In August 1993, on an evening that Doan was watching the children, Star suffered a "good size" bruise to the side of her jaw when she allegedly fell off a chair. (Trial Transcript at 383).[1] Also in August, Star's grandmother, Shirley Beisel, noticed severe burns on the bottom of Star's feet. The grandmother urged her daughter to seek medical attention for Star's burns, yet her daughter refused, stating she was "frightened." (Tr. at 388).

On the evening of September 29, 1993, Doan, along with the children, drove Beisel to work at approximately 8:00 p.m. As he often did, Doan looked after the children by himself that evening. Beisel arrived home on the morning of September 30 at 3:00 a.m. and Doan, who had been sleeping until she arrived, informed her that Star had been ill that evening, was vomiting, and had burned herself in the bathtub. Beisel went to check on Star, only to find the child dead in her crib. Beisel then called for emergency assistance.

---

[1]References to the trial transcript will hereinafter be cited as "Tr. at."

Paramedics arrived on the scene shortly thereafter. Fire department personnel on the scene noted a large, second-degree burn on Star's face and immediately suspected child abuse. The Cincinnati Police were notified, arrived on the scene, and brought Doan to the Homicide Department for questioning. Doan was read his Miranda rights verbatim from a standard Cincinnati Police form, and he signed the form stating that he understood his rights. Before being interviewed by homicide investigators, Doan was again read his rights from the same form, and again he signed the form indicating that he understood his rights.

During the officers' questioning, Doan first stated that he drove the children straight home after dropping Beisel off at work, and that he then placed Star in her bed while he cared for Sophia, Beisel's seven-year-old child. Doan stated that Star had been ill that evening and was looking very pale, and when he went to attend to the child, he noticed that she had vomited in her bed. Doan stated that he took her from her bed and laid her on the sofa, where again she vomited. Doan then undressed the child, took her to the bathroom, and placed her in the bathtub so that he could clean her up. Doan stated that the bathroom, as well as the surrounding rooms, were so dark that he did not notice any bruises or other injuries on Star's body when he placed her in the tub. Doan turned on the water in the tub and stated that he left the darkened bathroom with the water running for approximately one to two minutes so as to clean up the sofa, only to hear Star scream and then hear two "booms" as she fell in the tub. (Tr. at 663).

Doan stated that he then rushed into the bathroom and discovered Star lying on her back in the tub with water from the tub's faucet striking her in the face. Doan stated that he noticed that the cold water had been turned off in the tub and that she had burned herself from the water, so he took her out of the tub and applied an ointment to the burn.[2] Doan then

---

[2]On the night in question, Doan told both fire fighters and police officers that Star must have climbed up and adjusted the faucet handles.

or a bruise of her own or her painted lips in the jurors' bathroom mirror.

In other words, Juror A was simply trying to verify Doan's testimony that he did not see any of Star's bruises on the evening of her death because the bathroom and adjoining rooms were dark, based on her own experience. The fact that she confirmed her belief that Doan's testimony was false based on her own personal observation does not somehow transmogrify her act into an "experiment" as that term is used in the scientific world. In short, I do not think that the Ohio courts' application of Ohio R. Evid. R. 606(B) effectively denied Doan the opportunity to show a violation of his Sixth and Fourteenth Amendment rights to confront witnesses and evidence against him.

The general rule is that a juror may not impeach his verdict. *See In re Beverly Hill Fire Litigation*, 695 F.2d at 213. This rule reflects a policy concern in protecting the privacy of jury decisionmaking, which in turn secures the proper relationship of the jury to the judge and the law. *See* Charles Alan Wright & Victor James Gold, *Federal Practice and Procedure* § 6075 (1990). After all, "[t]he jury is the courtroom embodiment of those democratic ideals central to American social and political life." *Federal Practice & Procedure*, *supra*. The exception for "outside influence" must therefore be carefully and stringently applied so as to not undermine the jury's important role in our judicial system.

I therefore concur in the result.

What the majority is, in fact, doing is conducting an independent analysis. Hence the heavy reliance on lower federal court decisions, despite a disavowal to the contrary. However, *Williams* makes it clear that the lens through which we review habeas claims is restricted – the state court decision must be "contrary to . . . clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). I therefore think the majority has exceeded its authority on habeas review.

I also disagree with the majority's conclusion that Juror A introduced extraneous material. Juror A's experiment is not like the out-of-court juror experiments at issue in *In re Beverly Hills Fire Litigation*, 695 F.2d 207, 211-12 (6th Cir. 1982), where the juror examined his own aluminum wiring and connections in his home following testimony regarding aluminum wiring. It is equally unlike the extraneous information introduced in *United States ex rel. Owen v. McMann*, 435 F.2d 813 (2d Cir. 1970), where several jurors told other jurors about the defendant's bad history, which of course, was inadmissible evidence in any event, or the experiment on the Ford pickup truck conducted at a local Ford dealership at issue in *Durr v. Cook*, 589 F.2d 891, 892 (5th Cir. 1979). Juror A's "experiment" was really nothing more than a verification of her own experience and personal observation that bruises can be seen in dimmed lighting. After all, Juror A merely looked at her own body in dim lighting. Although she used lipstick to simulate the bruise, she could just have easily looked at her polished fingernails

---

*reasonable probability* that the result would have been different. *See id.* That is, the state court opinion would be "contrary to" Supreme Court precedent because it applied a different legal rule.

Other than providing a generic proposition that a defendant has a constitutional right to confront the evidence and the witnesses against him, the majority fails to explain how the state court's ruling in this case is "contrary to" a legal rule from a particular Supreme Court case. Indeed, it cannot do so, because the Supreme Court has not made a legal ruling in a case similar to the scenario presented here, which involves a mixed question of law and fact.

---

dressed her in the same clothes and eventually put her to bed around 1:00 a.m. Doan claims Star was still alive when he put her to bed.

After his initial statement, the police officers interviewing Doan responded skeptically to his explanation of how Star had been burned in the tub. Doan then changed his story, admitting that he may have done something that could have hurt her. Doan stated that, after arriving home from dropping off Beisel at work, he placed Star in a grassy area next to the car while he retrieved some of his things, and that he probably picked her up too fast off of the ground. Doan told the officers that when he picked her up, her body "folded up," and that when he threw her over his shoulder, this "caused her body and head to snap." (Tr. at 539).

Doan admitted to shaking the baby both before and after she was burned in the tub because her crying was getting on his nerves, and to striking her in the abdomen with a "karate chop" type blow. J.A. at 167-71. Following these admissions, Doan allowed the police officers to make an audio tape of his statement, so he again went through his account of what happened that night. At this point in time, Doan refused to take responsibility for the burn Star allegedly received in the bathtub.

Later this same morning, Doan was again questioned, this time by Police Specialist David Feldhaus, who had been dispatched to the hospital to examine Star's injuries. Feldhaus told Doan that he had observed Star's burn and that it was not consistent with being splashed by running water. Doan then admitted that he just wanted Star to stop crying, so he poured hot water on the baby's face using a cup. Officer Feldhaus then called in the other officers who had interviewed Doan earlier, and Doan again agreed to tape a statement, repeating for them what he had told Officer Feldhaus.

Along with the second-degree burn on her face, Star's autopsy revealed multiple contusions and hemorrhaging to the head, neck, tongue, thorax, abdomen, arms, legs, vagina, and rectum. Examiners also discovered several skull and

vertebral fractures, and a laceration of the duodenum. Dr. John Gerber, the pathologist who conducted Star's post-mortem examination, determined the cause of death to be "multiple bodily trauma." (Tr. at 499).

Doan was thereafter tried for the murder of Star Hollingsworth.[3] The taped confessions were admitted into evidence against Doan, yet Doan contended at trial that his confessions were coerced by the police. Doan testified at trial both that the police told him his confession would help him in court, and that the things he confessed to were not true. The jury ultimately found him guilty of one count of murder under Ohio Rev. Code § 2903.02 and one count of child endangerment under Ohio Rev. Code § 2919.22.

Following Doan's conviction, his attorney interviewed the jurors. One juror, to whom we will refer as "Juror A," told defense counsel that, following Doan's testimony that he did not see any of Star's bruises on the evening of her death because the bathroom and the adjoining rooms were so dark, Juror A conducted an experiment in her own home during the trial to see if he was telling the truth. Juror A put lipstick on her arm to simulate a bruise, and attempted to view the "bruise" in a room lit similarly to the rooms that Star was in that evening. The experiment confirmed her belief that one could see bruises in such lighting, and she then told a defense team investigator that she had "informed other members of the jury of her experiment during deliberations." J.A. at 40 (Dee Aff.). Juror A also stated that, during deliberations, she looked up the definitions of "purposeful" and "intent" in a dictionary "in order to clarify [her] understanding of those words." J.A. at 62-63. Juror A memorialized these statements in a sworn affidavit.

Before sentencing, Doan filed a motion for a new trial pursuant to Ohio R. Crim. P. 33 alleging, in part, juror

---

[3]Catherine Beisel was charged with involuntary manslaughter arising out of the death of her daughter, and was to be prosecuted separately following Doan's trial.

Juror A's status as a juror bears little resemblance to the official character of the bailiff in *Parker*. It was therefore impossible for the Ohio Court of Appeals to have reached a result opposite to Supreme Court precedent on a case with "materially indistinguishable" facts. The majority's reasoning is premised on an analogy of the bailiff in *Parker* to the juror in this case, but such legal methodology is not authorized by § 2254(d)(1) and *Williams*.

In *Mattox v. United States,* 146 U.S. 140, 149 (1892), the extraneous and prejudicial information was introduced via a bailiff's inappropriate comments and also by a newspaper article. The *Mattox* court held that "[p]rivate communications, possibly prejudicial, between jurors and third persons, or witnesses, or the officer in charge, are absolutely forbidden, and invalidate the verdict, at least unless their harmlessness is made to appear." *Id.* at 150. Again, the extraneous and prejudicial information was introduced by external sources, including an "officer in charge." *See id.* at 151. Again, although an analogy may be made, it simply cannot be said that the Ohio court ignored Supreme Court precedent with "materially indistinguishable" facts.[2]

---

[2]Having failed to establish that the Ohio courts arrived at a result different from Supreme Court precedent on materially indistinguishable facts, the majority, in a footnote, now claims that "[r]egardless of any factual differences . . . the state court's use of Ohio Evid. R. 606(B) in this case 'contradicts the governing law set forth in' Supreme Court precedent recognizing the fundamental importance of Doan's constitutional right to confront the evidence and the witnesses against him."

Again, the majority is misapplying *Williams.* The "contradicts the governing law" language in *Williams* must be read in conjunction with the principle it is explaining: that "a state-court decision is contrary to this Court's precedent if the state court arrives at a conclusion opposite to that reached by this Court on a question of law." *Williams v. Taylor*, 120 S. Ct. 1495, 1519 (2000). *Williams* even provided an illustration. *Williams* explained that if a state court rejected a prisoner's claim of ineffective assistance of counsel on the grounds that the prisoner had not established by a preponderance of the evidence that the outcome would have been different, such a decision would be "contrary to" Supreme Court precedent because *Strickland* held that the prisoner need only demonstrate

---

**CONCURRENCE**

---

SUHRHEINRICH, Circuit Judge, concurring. I concur in the result reached in this case. I write separately because I think the majority has ignored the mandate of 28 U.S.C. § 2254(d)(1) and *Williams v. Taylor*, 120 S. Ct. 1495 (2000). I agree that the "unreasonable application" prong of § 2254(d)(1) does not govern our analysis, because the state court did not identify "clearly established Federal law." I do not agree, however, that the Ohio Court of Appeals's decision was "contrary to" to clearly established Supreme Court precedent as of the time of its decision.

As the majority notes, *Williams* explained that "contrary" means "diametrically different, opposite in character or nature, or mutually opposed," *id.* at 1519. Further, for a state court's decision to be "contrary to" established Supreme Court precedent, it must "arrive[] at a conclusion opposite to that reached by this Court on a question of law[,]" or reach an opposite conclusion in a case with "materially indistinguishable" facts. *Id.* The cases the majority cites in support of its analysis are not that. *Parker v. Glidden*, 385 U.S. 363 (1966) (per curiam), involved prejudicial comments by a bailiff to the jury. Central to the Court's holding that the defendant's Sixth and Fourteenth Amendment rights had been violated was the "the official character of the bailiff -- as an officer of the court as well as the State." *Id.* at 365.[1] In the Court's view, "the unauthorized conduct of the bailiff involves such a probability that prejudice will result that it is deemed inherently lacking in due process." *Id.* (internal quotation marks omitted).

---

[1]The Court also emphasized the fact that the jury deliberated for twenty-six hours, indicating a difference of opinion regarding the petitioner's guilt, and that one of the jurors testified that she was prejudiced by the bailiff's comments. *See id.* at 365.

misconduct. The trial court denied the motion. Doan was then sentenced to fifteen years to life for murder and five to fifteen years for child endangerment, with the sentences to be served consecutively.

The Ohio Court of Appeals affirmed his conviction. The court stated that, while Juror A's "conduct was improper, and may well have been prejudicial to appellant[,]" Ohio Evid. R. 606(B) dictated that the juror's post-trial affidavit was inadmissible evidence that could not be used as a basis for granting a new trial. *State v. Doan*, No. C-940330, 1995 WL 577524, at *2 (Ohio Ct. App. Sept. 29, 1995). The Supreme Court of Ohio denied Doan's delayed appeal, which was pending before the court as a "discretionary appeal and a claimed appeal of right." J.A. at 120.

Doan then filed a petition for habeas corpus relief in the United States District Court for the Southern District of Ohio. The district court denied Doan's petition for a writ of habeas corpus, holding that Doan had procedurally defaulted all of his habeas claims except for the juror misconduct claim involving Juror A. The court then stated that the juror misconduct claim was barred because the Ohio Court of Appeals had relied on an adequate and independent state ground, Ohio Evid. R. 606(B), in disposing of the claim. The district court concluded that, while it did not think that Ohio Evid. R. 606(B) denied Doan's constitutional right to a fair trial, a certificate of appealability should be issued solely on the question of "whether the State courts' application of Ohio R. Evid. 606(B) in this case deprived petitioner of a fair trial[.]" J.A. at 134 (D. Ct. Order Den. Habeas). Doan then appealed the district court's decision to this court.

## II. ANALYSIS

### A. Procedural Default

It is well settled that a federal court may not, absent a showing of either cause and prejudice or a fundamental miscarriage of justice, "review a question of federal law decided by a state court if the decision of that court rests on

a state law ground that is independent of the federal question and adequate to support the judgment. This rule applies whether the state law ground is substantive or procedural." *Coleman v. Thompson*, 501 U.S. 722, 729 (1991) (citations omitted). In its order denying Doan habeas relief, the district court held that it was barred from reviewing Doan's constitutional claim because the Ohio Court of Appeals's decision disposing of the claim was based on Ohio Evid. R. 606(B), an adequate and independent state ground. On appeal the Warden argues that the procedural default doctrine bars federal habeas review of Doan's federal constitutional claim because the state judgment rests on an adequate and independent state ground, *i.e.*, Ohio Evid. R. 606(B).

We conclude that Ohio Evid. R. 606(B) cannot serve as an adequate basis for the state court's decision in this case under the adequate and independent state ground doctrine. A state court's decision on a question of state law is adequate to support its judgment only if the "state law basis for the decision is sufficient by itself to support the judgment, regardless of whether the federal law issue is affirmed or reversed." Erwin Chemerinsky, Federal Jurisdiction § 10.5.2, at 619 (2d ed. 1994). In this case, however, whether Ohio Evid. R. 606(B) is sufficient to support the state court of appeals's judgment clearly depends upon whether the Rule conflicts with the guarantees of the U.S. Constitution. The Supremacy Clause states that the "Constitution . . . shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. If Ohio Evid. R. 606(B) is contrary to the U.S. Constitution, it may not serve as the basis for the state court of appeals's judgment. Thus, "[s]tate law obviously is not adequate to support the result when there is a claim that the state law itself violates the United States Constitution." Chemerinsky, *supra*, § 10.5.2, at 619.

One example of this proposition is the Supreme Court case of *Staub v. City of Baxley*, 355 U.S. 313, 318-20 (1958). In *Staub*, a union organizer was convicted under a city ordinance

## III.  CONCLUSION

For the foregoing reasons, we hold that, while the Ohio courts' application of Ohio Evid. R. 606(B) prevented Doan from asserting his constitutional right to a fair trial, and while Juror A's presentation of her out-of-court experiment was constitutional error, this error was harmless. Thus, we **AFFIRM** the district court's judgment denying Doan's petition for a writ of habeas corpus.

In addition, we again see inconsistency in Doan's testimony regarding what he could and could not observe in the dimly lit apartment. Doan claimed that the bathroom was very dark so that he could not see if Star had any bruises, yet he later testified that, upon rushing into the darkened bathroom, he immediately noticed that Star had burned her face because it was "bright red, like a sunburn." (Tr. at 664).

Finally, the State, in its closing argument, discussed another fundamental problem with Doan's story. Doan states that he heard two booms as Star allegedly fell in the bathtub. Apparently, Doan would have the jury believe that these two booms resulted in the two major contusions on Star's head. Yet, the pathologist who conducted Star's post-mortem examination noted that the two contusions were on opposite sides of the back of the child's head. Thus, Doan would have the jury believe that the child fell twice, in rapid succession, while attempting to climb up in the tub and adjust the faucet handles. The skull fractures, however, are inconsistent with falling in the tub, and the second-degree burn is inconsistent with being splashed by hot water.

Thus, in light of Doan's own taped confessions that were admitted into evidence describing in detail the violent acts that he committed against Star, the serious inconsistencies between Doan's testimony and the medical evidence, and the clear inconsistencies in Doan's testimony itself, we hold that the jury's consideration of a juror's out-of-court experiment testing the credibility of Doan was harmless error. The burden in this analysis is on the habeas petitioner, and he has failed to show that the juror misconduct "had [a] substantial and injurious effect or influence in determining the jury's verdict[.]" *Nevers*, 169 F.3d at 371. Instead, the significant holes and inconsistencies in Doan's testimony show that the juror experiment regarding her ability to see lipstick on her arm in a darkened room would not substantially affect or influence the jury's view that Doan was not a credible witness, nor would it similarly affect or influence the jury's ultimate verdict. Thus, habeas relief cannot be granted.

that required a written application to the mayor and city council for issuance of a permit to solicit membership for any organization. *Id*. at 314-15 & n.1. The organizer argued to the state courts that the city ordinance violated her freedoms of speech, press, and lawful assembly pursuant to the First and Fourteenth Amendments of the U.S. Constitution, yet the state court of appeals refused to address her constitutional claims, holding that her failure to seek a permit in accordance with city law prevented her from raising her constitutional claims on appeal. *Id*. at 317-18. On appeal to the U.S. Supreme Court, the City argued that the appeal should be dismissed for lack of jurisdiction because the state court of appeals decision "was based upon state procedural grounds and thus rests upon an adequate nonfederal basis[.]" *Id*. at 318. The Supreme Court disagreed, holding that there was no adequate state ground for the state court of appeals decision. *Id*. at 320. The Court held that a state court's reliance on an unconstitutional ordinance cannot serve as an adequate ground for its judgment, stating that, otherwise, the use of "plainly untenable" state grounds would allow state courts effectively to avoid Supreme Court review of constitutionally impermissible results. *Id*. at 319-20 (internal quotation omitted).

Just as in *Staub*, the Warden cannot put forth Ohio Evid. R. 606(B) as an adequate and independent basis for the state court decision, thus avoiding Supreme Court review, when the very application of that evidence rule is alleged to prevent Doan from ever showing that his federal constitutional right to a fair and impartial jury that considers solely the evidence presented to it at trial was violated. To hold otherwise would allow a state and its courts to evade the requirements of the United States Constitution any time they chose to apply a state procedural rule, regardless of whether that state rule complied with federal constitutional guarantees. The Supremacy Clause forbids a state from using a state rule to trump the fundamental requirements of the United States Constitution. U.S. Const. art. VI, cl. 2.

Furthermore, the Ohio Court of Appeals did not neglect Doan's constitutional claim because he had failed to bring it to the court's attention. Rather, Doan explicitly raised the constitutional argument in his brief to the Ohio Court of Appeals, yet that court simply failed to address it, apparently holding that Ohio Evid. R. 606(B) rendered Doan's constitutional argument immaterial. *See* Appellant's Br. to Ohio Ct. App. at 7 ("The Sixth Amendment to the Constitution of the United States and Article I Section 10 of the Ohio Constitution require that every person charged with a crime shall have a fair trial before an impartial jury. The jury's verdict must be based solely upon evidence presented at trial."). Since the Warden's claim of procedural default based on an adequate and independent state ground fails, we must review Doan's federal constitutional claim.

## B. Doan's Right to a Fair Trial

### 1. Standard of Review

When reviewing the district court's disposition of a habeas corpus petition pursuant to 28 U.S.C. § 2254, this court reviews the district court's legal conclusions de novo. *See DeLisle v. Rivers*, 161 F.3d 370, 380 (6th Cir. 1998) (en banc), *cert. denied*, 526 U.S. 1075 (1999). Under § 2254, habeas relief may not be granted with respect to any claim adjudicated on the merits in state court unless the adjudication:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2).

Immediately thereafter, however, Doan changed his story. Rather than being able to see Star's vomit, Doan testified that he knew she had vomited because he could hear her vomiting. Doan admitted that this was the first time he had ever told anyone this version of the events of that evening. (Tr. at 738-40).

Doan testified that, after undressing Star, he then took her into the bathroom to give her a bath. As with other rooms in the house, Doan testified that it was too dark in the bathroom to see if she had any bruises. Doan stated that he turned the water on in the tub and left the child sitting in the bathtub in the "very dark" bathroom while he went to clean up the vomit on the sofa. (Tr. at 661-63). Doan testified that, while cleaning up the sofa, he heard Star scream and then heard two "booms" as she fell in the tub. (Tr. at 663). Upon rushing into the bathroom, Doan testified that he saw Star lying on her back, and that hot water from the tub's faucet was striking her face. Doan took her out of the tub and could see that she had burned her face. On the night in question, Doan told both fire fighters and police officers that Star must have climbed up and adjusted the faucet handles.

There are several problems with Doan's explanation of how Star incurred both her head injuries and her second-degree burn. First, a medical expert testified at trial that the burn on Star's face was not consistent with the splashing or splattering of water, and that there was a clear line of demarcation on her face between where there was and was not a burn. Nor was there an indication of recent scalding on any other part of her body. Second, the same expert testified that the skull fractures, which were consistent with the contusions on Star's head, would not have occurred from a fall in the tub.

---

Q. But you were able to see vomit at that point and just the aquarium light on?
A. Yes.
(Tr. at 736-37).

her body after he had watched her were there prior to the time he arrived home that night. Doan had a difficult time keeping his story straight, however.

When Doan and the children arrived home after dropping Catherine off at work, Doan testified that he laid Star in her bed while he tended to Sophia. When tucking Sophia in for the night, he turned the bedroom light on and noticed that Star, who was still fully clothed, had vomited in her bed. Doan picked her up and carried her into the living room, where he laid her down on the sofa. Doan stated initially that he saw her vomit again on the sofa, and he then took her clothes off so he could give her a bath. On cross-examination, Doan stated that the living room was too dark to see if she had bruises on her body, yet he admitted that he was able to see her vomit on the sofa. The prosecuting attorney pointed out several of the major contusions on Star's body, and Doan stated that he could not see any of those bruises even after he had taken her clothes off. Nevertheless, Doan still briefly maintained that he could see her vomit.[10]

_____

[10]More specifically, we note the following exchange between the State's attorney and Doan on Doan's cross-examination:

Q.   And when you took her clothes off of her, what did you see?
A.   I did not see nothing because it was pretty much dark in there. I didn't want to turn the lights on because Sophia was in bed.
Q.   You were able to see vomit, right?
A.   That is correct.
Q.   Did you see this mask bruise here on her side that the coroner testified bruised her spleen?
A.   No, I did not.
Q.   You could see vomit, that she had some fluid that she had puked, but you could not see this bruise?
A.   That's right.
Q.   So it was not there then?
A.   It could have been but I didn't see it, no.
Q.   Did you see these seven bruises on her back?
A.   No, I did not.
Q.   You did not see that either. Did you see all these bruises running up and down her right flank when you did that?
A.   No.

The Supreme Court, in *Williams v. Taylor*, 120 S. Ct. 1495 (2000), further elaborated upon the precise meaning of this statutory language, holding that independent meaning should be given to the phrases "contrary to" and "unreasonable application of" in § 2254(d)(1). *Id*. at 1519. The Court stated that, for a state court's decision to be "contrary to" clearly established Supreme Court precedent, it must "arrive[] at a conclusion opposite to that reached by this Court on a question of law[,]" or it must face a set of facts that are "materially indistinguishable from a relevant Supreme Court precedent" and still arrive at an opposite result. *Id*. A state court "unreasonably appli[es]" clearly established Supreme Court precedent when it correctly identifies the governing legal principle in the case, yet it unreasonably applies that principle to the facts of the defendant's case. *Id*. at 1520. A state court also unreasonably applies Supreme Court precedent when it "unreasonably extends a legal principle from our precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Id*. The *Williams* Court further stated that a federal habeas court may not overturn a state court's decision simply because it believes that a state court applied Supreme Court precedent incorrectly. *Id*. at 1522. Instead, the state court's application of Supreme Court precedent must also be objectively unreasonable. *Id*. at 1521-22.

In analyzing whether a state court's decision is "contrary to" or an "unreasonable application of" clearly established Supreme Court precedent, we may only look to the "holdings, as opposed to the dicta, of th[e] Court's decisions as of the time of the relevant state-court decision." *Id*. at 1523. As is dictated by the statute, we may not "look to lower federal court decisions in deciding whether the state decision is contrary to, or an unreasonable application of, clearly established federal law." *Herbert v. Billy*, 160 F.3d 1131, 1135 (6th Cir. 1998).

## 2.   Evaluating the State Court's Decision In Light of *Williams*

The Ohio Court of Appeals was the last court in Ohio to address the merits of Doan's appeal.  In his brief to the Ohio Court of Appeals, Doan argued that the juror's misconduct in conducting an experiment in her own home, the results of which she told to other members of the jury, violated his Sixth Amendment right under the United States Constitution to have a fair trial before an impartial jury in which the jury's verdict is based solely upon the evidence presented at trial. *See* Appellant's Br. to Ohio Ct. App. at 7, 11.  The Ohio Court of Appeals did not address this argument in its opinion, however.  Instead, it based its decision entirely on Ohio Evid. R. 606(B),[4] which states that in order for a juror to testify as to an extraneous influence that was brought to the jury's attention during the trial or deliberations, there must be some independent evidence from a source with firsthand knowledge other than the jurors themselves.  *See State v. Schiebel*, 564 N.E.2d 54, 61 (Ohio 1990), *cert. denied*, 499 U.S. 961 (1991).  The Ohio Court of Appeals noted that, because there was no outside evidence of juror misconduct that stemmed

---

[4] Ohio Evid. R. 606(B) states:
Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon his or any other juror's mind or emotions as influencing him to assent to or dissent from the verdict or indictment or concerning his mental processes in connection therewith. A juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear on any juror, *only after some outside evidence of that act or event has been presented.* However a juror may testify without the presentation of any outside evidence concerning any threat, any bribe, any attempted threat or bribe, or any improprieties of any officer of the court. His affidavit or evidence of any statement by him concerning a matter about which he would be precluded from testifying will not be received for these purposes.
(emphasis added).

---

striking, and burning Star, "[i]t would help [him] in court." (Tr. at 678).  Other evidence and testimony presented at trial, however, including Doan's impeached testimony on cross-examination, convincingly show that Doan's taped confessions were reliable.

Catherine Beisel's mother, Shirley Beisel, testified at trial that she had spent time with Star just a few hours before Doan was left with the children on the night of Star's death.  Shirley Beisel testified that she had played with Star at approximately 4:00 p.m. and that she did not notice anything unusual about Star's appearance or behavior.  When Doan arrived home that evening before driving Catherine to work, he said he noticed that Star looked pale and sick, yet he did not note anything else unusual about her appearance.

Star's autopsy report revealed numerous contusions and hemorrhaging over much of Star's body, including her head. A theme of Doan's defense, developed both during his direct examination and in closing arguments, was that there was a gap of time between approximately 4:00 p.m., when Star's grandmother last saw her alive, and 7:30 p.m., when Doan arrived at the apartment after work, that was unaccounted for, and that Star's injuries may have occurred during this time. In his closing, Doan's defense attorney lamented the fact that he was unable to call Catherine Beisel as a witness to determine if Star had suffered injuries before Doan arrived.[9]

While Doan's defense insinuates that many of Star's injuries may have been inflicted before Doan arrived, Doan admitted on cross-examination that the contusions on Star's head occurred while he was watching her.  Doan insisted throughout his testimony that, on the night in question, he never actually saw Star without her being fully clothed, and thus he could not determine whether the bruises that covered

---

[9] Catherine Beisel, who was set to stand trial on charges of involuntary manslaughter the week after Doan's trial, was called by the defense, outside the presence of the jury, and exercised her Fifth Amendment right against self-incrimination.

other members of Doan's jury in violation of Doan's Sixth and Fourteenth Amendment rights. Instead, even though we hold that the extraneous influence on the jury in this case amounted to constitutional error, we may not grant habeas relief if that error was harmless. *Nevers v. Killinger*, 169 F.3d 352, 369-70 (6th Cir.), *cert. denied*, 527 U.S. 1004 (1999). We now turn to the question of whether the constitutional error at trial was, indeed, harmless.

### 3. Harmless Error

In applying the harmless error analysis on habeas review for cases governed by the Antiterrorism and Effective Death Penalty Act, this circuit has held that the harmless error standard set out in *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993), should apply, even when the "federal habeas court is the first to review for harmless error." *Gilliam v. Mitchell*, 179 F.3d 990, 995 (6th Cir. 1999), *cert. denied*, 120 S. Ct. 945 (2000). Under this standard, a habeas petitioner must show that the trial error "had substantial and injurious effect or influence in determining the jury's verdict[.]" *Brecht*, 507 U.S. at 637 (citation and internal quotation marks omitted). Thus, in order for this court to grant Doan habeas relief, he must demonstrate that the results of Juror A's experiment, having been relayed to other members of the jury, substantially affected or influenced the jury's verdict. After an exhaustive review of the state trial record, we conclude that the jury's consideration of extraneous material in this case was harmless error.

The most damaging evidence presented by the prosecution was, of course, Doan's taped statements confessing to striking, shaking, and scalding the face of fifteen-month-old Star Hollingsworth. The police officers who interviewed Doan on the night of the murder explained the substance of Doan's confession to the jury, and the taped confessions were played, in their entirety, during the trial. In his direct examination, Doan denied harming the baby and stated that the police officers convinced him to make an insincere confession by telling him that, if he admitted to shaking,

from evidence provided by anyone other than the jurors themselves, Ohio Evid. R. 606(B) rendered Juror A's affidavit acknowledging her experimentation inadmissible. The state court of appeals, because it found the Ohio evidence rule to be controlling, apparently did not deem it necessary to address Doan's federal constitutional argument that such juror experimentation effectively denies his rights under the Sixth Amendment.

Ohio's Rule 606(B) codifies the "aliunde rule," a rule dating back to the day of Lord Mansfield, which states that "the verdict of a jury may not be impeached by the evidence of a member of the jury unless foundation for the introduction of such evidence is first laid by competent evidence . . . from some other source." *State v. Adams*, 48 N.E.2d 861, 863 (Ohio 1943). This "rule is designed to protect the finality of verdicts and to ensure that jurors are insulated from harassment by defeated parties." *Schiebel*, 564 N.E.2d at 61. While Federal Rule of Evidence 606(b) closely parallels the Ohio rule in most respects, it does not codify the aliunde rule. Instead, Federal Rule 606(b) allows a juror to testify about any "extraneous prejudicial information [that] was improperly brought to the jury's attention[.]" This is quite different from the aliunde rule, which allows consideration only of extraneous prejudicial information that can be verified by some source outside the jury. The Ohio Court of Appeals noted explicitly in its opinion that if Federal Rule 606(b) had applied to Doan's trial, the evidence of juror misconduct would likely have been admissible. *Doan*, 1995 WL 577524, at *3 ("Ohio's rule is different, requiring a different result in the present case.").

Because the Ohio Court of Appeals did not even identify in its opinion that Doan had a federal constitutional right to a fair and impartial jury that considers in its deliberations only the evidence presented against him at trial, the "unreasonable application" prong of § 2254(d)(1) does not govern our analysis. The Ohio Court of Appeals did not, as the Supreme Court defined an unreasonable application, correctly identify the governing legal principle only to unreasonably apply that

principle to the particular facts of the case at hand. *See Williams*, 120 S. Ct. at 1520. On the contrary, the Ohio Court of Appeals completely failed to identify Doan's Sixth Amendment rights in its analysis, implicitly holding that Ohio Evid. R. 606(B) trumps the constitutional arguments that the defendant raised.

The question, then, is whether the Ohio Court of Appeals's decision applying Ohio's Rule 606(B) in spite of Doan's Sixth Amendment claim is "contrary to" clearly established Supreme Court precedent as of the time of its decision. We hold that it is.

As stated earlier, the Supreme Court in *Williams* further defined what it means for a state court decision to be "contrary to" clearly established Supreme Court precedent. The *Williams* Court noted that "contrary" is defined as "diametrically different, opposite in character or nature, or mutually opposed." *Williams*, 120 S. Ct. at 1519 (internal quotation marks omitted). Thus, a state court decision will be "contrary to" clearly established Supreme Court precedent only if it "applies a rule that contradicts the governing law set forth in [Supreme Court] cases[,]" or if it "confronts a set of facts that are materially indistinguishable from a [Supreme Court decision] and nevertheless arrives at a result different from [Supreme Court] precedent." *Id.*

Doan argues that, because Ohio Evid. R. 606(B) prevents the consideration of clear evidence of jury misconduct in this case, the rule's application violated his federal constitutional right to a fair trial. The Supreme Court has recognized the right to a fair trial as arising out of both the Sixth and Fourteenth Amendments.[5] *See Faretta v. California*, 422

---

[5] The Sixth Amendment states that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining

relinquished upon entering the doors of a state courtroom.[8] *See id.* at 213-14.

Thus, we conclude that the Ohio courts' application of Ohio Evid. R. 606(B) effectively denied Doan the opportunity to show a violation of his Sixth and Fourteenth Amendment rights to confront the evidence and the witnesses presented against him, as well as his right to a jury that considers only the evidence presented at trial. Furthermore, the Ohio courts applied Ohio Rule 606(B) while ignoring Doan's constitutional claim, thereby violating clearly established Supreme Court precedent recognizing the fundamental importance of Doan's constitutional right to a fair trial. Nevertheless, we may not grant habeas relief simply because Juror A presented the results of an improper experiment to

---

[8] We noted *supra* that if Fed. R. Evid. 606(b) had applied in this case rather than Ohio Evid. R. 606(B), testimony regarding improper juror experiments communicated to other members of the jury would be admissible since Fed R. Evid. 606(b) does not require that the evidence of misconduct come from some outside source independent of the jury. Some circuits have stated that in federal habeas proceedings brought pursuant to § 2254, Fed. R. Evid. 1101(e) provides that the Federal Rules of Evidence should be applied in deciding whether juror testimony is admissible to impeach a jury verdict. *McDowell v. Calderon*, 107 F.3d 1351, 1367 (9th Cir. 1997), *rev'd on other grounds*, 130 F.3d 833, 835 (9th Cir. 1997) (en banc), *cert. denied*, 523 U.S. 1103 (1998); *see also Gosier v. Welborn*, 175 F.3d 504, 511 (7th Cir.), *cert. denied*, 120 S. Ct. 502 (1999) (stating, in dicta, that nothing in the language or history of Fed. R. Evid. 606(b) indicates that it should not "appl[y] equally" to state court verdicts reviewed in federal habeas proceedings, yet not discussing what would happen if the federal rule conflicted with a state evidence rule that was applied in the state proceedings). In *McDowell*, the Ninth Circuit stated that Fed. R. Evid. 606(b) would apply despite a potentially conflicting state evidence rule. *McDowell*, 107 F.3d at 1367.

In light of the deference to state proceedings called for by AEDPA, it seems strange indeed that a federal habeas court would apply its own rules of evidence despite a conflicting state rule when it is simply reviewing the state court record in making its determination, rather than holding an evidentiary hearing in federal court. *See Shillcutt v. Gagnon*, 827 F.2d 1155, 1161 (7th Cir. 1987) (Ripple, J., concurring). We decline to apply Fed. R. Evid. 606(b) in this case since the district court did not hold an evidentiary hearing.

Fifth Circuit remanded the case to the district court to hold an evidentiary hearing and for further proceedings.

This circuit has also addressed the threat that out-of-court juror experiments pose to a defendant's right to a fair trial. In *In re Beverly Hills Fire Litigation*, 695 F.2d 207, 211-12 (6th Cir. 1982), *cert. denied*, 461 U.S. 929 (1983), a federal diversity case, following a plaintiffs' expert witness's testimony, a juror conducted "an improper experiment" when he examined the aluminum wiring in his home and reported his findings to at least six other jurors during the course of the trial. The defendants in the case contended that the juror's conduct was neither an experiment nor an intentional attempt to uncover additional information, but instead was a "personal" experience "which could not have affected the judgment of that juror or those to whom he communicated that information." *Id*. at 213. This court held to the contrary, however, stating that, rather than this being a "mental or emotional reaction or expression" during deliberations, this was an experiment that tainted the jury's verdict by "injecting extraneous information into the trial." *Id*.

We explained in *Beverly Hills* that while the general rule under federal evidence law is that a juror may not impeach his verdict, an exception to this rule exists where external factors were present that may have affected the jury's deliberations. *Id*. This exception exists "to assure that the parties receive a fair trial and that the integrity of the system itself is maintained." *Id*. We held that, because the experiment effectively provided the jurors with evidence not presented at trial, and because the information was so likely to have been prejudicial, we had no choice but to reverse the jury's verdict and remand for a new trial. *Id*. at 214-15. It is important to note that, even though the Federal Rules of Evidence applied in *Beverly Hills*, we spoke generally of the fundamental requirements of a fair trial, protections that are not

U.S. 806, 818 (1975); *Chambers v. Mississippi*, 410 U.S. 284, 294 (1973). In explaining what is encompassed in the right to a fair trial, the Court has held that it adheres to "the 'undeviating rule' that the rights of confrontation and cross-examination are among the fundamental requirements of a constitutionally fair trial." *Parker v. Gladden*, 385 U.S. 363, 364-65 (1966) (citation omitted). The Court has further held that:

> In the constitutional sense, trial by jury in a criminal case necessarily implies at the very least that the evidence developed against a defendant shall come from the witness stand in a public courtroom where there is full judicial protection of the defendant's right of confrontation, of cross-examination, and of counsel.

*Turner v. Louisiana*, 379 U.S. 466, 472-73 (1965) (quotation omitted).

In *Parker*, the Supreme Court held that prejudicial comments to a jury by a bailiff during deliberations violated the defendant's Sixth and Fourteenth Amendment rights. The bailiff, who was assigned to a sequestered jury, stated to one of the jurors in the presence of others that the defendant was a "wicked man," that he was guilty, and that if there was an error in finding the defendant guilty, the Supreme Court would correct it. *Parker*, 385 U.S. at 363-64. The Court held that the defendant's right to confront and cross-examine the witnesses against him was violated by these comments, and that, given the official nature of the bailiff's position, the likelihood for prejudice was high. *Id*. at 365.

Just as the bailiff in *Parker* was essentially acting as a witness whose testimony the defendant could not confront and possibly discredit through cross-examination or the presentation of other evidence, so too was Juror A acting as a witness here in her statements to her fellow jurors regarding

---

witnesses in his favor, and to have the Assistance of Counsel for his defence." U.S. Const. amend. VI.

the results of her out-of-court experiment. As applied in this case, Ohio's Rule 606(B) allowed Juror A to conduct an experiment in her own home, even though it may have been deeply flawed in its methodology, and to present the results of that experiment to her fellow jurors, even though it may have substantially impaired the defendant's credibility, simply because no one else saw her conduct the experiment or heard her relay the results of that experiment to other jurors. Ohio Rule 606(B), by denying the Ohio courts the ability to consider evidence of the jury misconduct in this case, denied Doan's right to confront the witnesses and the evidence against him, and thus clearly stands in conflict with Supreme Court precedent recognizing the fundamental importance of this constitutional right.

The Warden argues that Doan's case is distinguishable because no inappropriate communications between a court official, or other outside source, and Doan's jury occurred. *See* Appellee's Br. at 20-21. Rather, the Warden argues that any misconduct in this case was the result of communication among the jurors themselves, and that "'the evidence of jurors[,] as to the motives and influences which affected their deliberations[,] is inadmissible either to impeach or to support the verdict.'" Appellee's Br. at 20-21 (quoting *Mattox v. United States*, 146 U.S. 140, 149 (1892)). The Warden, however, misrepresents the holding of *Mattox*.

In *Mattox*, following a federal jury's guilty verdict, the defendant attempted to introduce several jurors' affidavits stating that the bailiff in charge of the jury had made inappropriate comments to them regarding the defendant's guilt and concerning certain incriminating evidence against the defendant that was not presented at trial. *Id*. at 142. The jurors also stated in their affidavits that, while they were deliberating, a newspaper was brought into the jury room that contained an opinion piece on the details of the trial and the strength of the evidence against the defendant. *Id*. at 143. This article was read aloud in the presence of the entire jury. *Id*.

Judge Friendly explained that while jurors can take into account their own wisdom, experience, and common sense, "in doing so [they] must not bring extra facts into the jury room . . . . To the greatest extent possible all factual [material] must pass through the judicial sieve, where the fundamental guarantees of procedural law protect the rights of those accused of crime." *Id*. at 818 (citation omitted). The State claimed that, because this case involved jury misconduct inside the jury room as opposed to impropriety outside the jury room, both federal and New York law would hold it inadmissible. *See id*. at 819. The Second Circuit disagreed, stating that it is the nature of the extraneous material and its likely effect on the hypothetical average jury, "not the source of the information or the locus of its communication, which determines whether the defendant has been prejudiced[,]" and thus whether his constitutional rights were violated. *Id*. at 820.

Since *Owen*, several circuits have followed suit in holding that a jury's consideration of extraneous material violates a defendant's constitutional rights. In *Durr v. Cook*, 589 F.2d 891, 892 (5th Cir. 1979), another case similar to this one, a Louisiana prisoner petitioned for habeas corpus relief on the grounds that a juror's out-of-court experiment violated his constitutional rights to confrontation and due process. In *Durr*, the jury foreman allegedly conducted an experiment at a local Ford dealership during the trial, making twisting movements in a Ford pickup truck in order to test the defendant's self-defense explanation. *Id*. The state trial court, on a motion for a new trial, enforced a Louisiana statute which prevented a juror from impeaching his own verdict, and held that the foreman could not testify as to the experiment or whether the results of that experiment were passed on to the rest of the jury. *Id*. at 892-93. The Fifth Circuit on habeas review, however, held that the defendant's constitutional rights take precedence over the Louisiana statute, and because the defendant "presented a substantial claim that his rights may have been violated," the foreman must be allowed to testify as to his conduct. *Id*. at 893. The

While we may not look to the decisions of lower federal courts for guidance when deciding whether a state court decision is contrary to clearly established Supreme Court precedent, *Herbert*, 160 F.3d at 1135, it is worth noting that we are by no means the first federal court of appeals to recognize that a state's "aliunde" evidence rule cannot be applied to violate a defendant's constitutional right to a fair trial. Thirty years ago, in *United States ex rel. Owen v. McMann*, 435 F.2d 813 (2d Cir. 1970), *cert. denied*, 402 U.S. 906 (1971), the Second Circuit, in an opinion by Judge Friendly, decided a case strikingly similar to this one. In *Owen*, a state prisoner sought federal habeas relief, arguing that his Sixth Amendment right to confrontation had been violated by extraneous statements made by three jurors about the defendant. *Id*. at 815. In *Owen*, the jurors had no outside contact with a court official, or anyone else for that matter; instead, several jurors told other jurors during the trial that they knew about the defendant's history, and that he was a bad person who was always getting in trouble. *Id*. As in Ohio, New York evidence law dictated that juror testimony regarding this misconduct was inadmissible to impeach the verdict. *Id*. at 819.

On appeal, the State of New York argued that, pursuant to a firmly embedded rule of evidence in New York, jurors could not impeach a verdict simply on the basis of what they said occurred in the deliberating room, that there were strong public policy justifications for that rule, and that the Second Circuit should not carve out an exception to the rule in that case. *Id*. Judge Friendly noted, however, that the "State could not seriously contend that even if Owen were denied due process by virtue of the jury's consideration of prejudicial extra-record facts, New York law may independently foreclose him from challenging his conviction on federal constitutional grounds[.]" *Id*. Despite the policy considerations weighing in favor of the New York evidence rule, the Second Circuit held that the habeas petitioner's constitutional right to due process was violated. *Id*. at 816-20.

The Supreme Court held that the juror affidavits in *Mattox* should have been considered by the trial court when addressing the defendant's motion for a new trial, and, in light of the affidavits, the Court then granted the defendant's motion for a new trial. *Id*. at 148-49, 151. In doing so, the Court distinguished between that juror testimony which can and that which cannot be used to set aside a jury verdict. *Id*. The Court held that a matter "resting in the personal consciousness of one juror" may not be used to upset a jury's verdict "because, being personal, it is not accessible to other testimony." *Id*. at 148. The Court stated that it would not give the "secret thought[s] of one [juror] the power to disturb the expressed conclusions of twelve." *Id*. In sharp contrast to the secret thoughts of jurors, the Court held that juror testimony as to "overt acts" of misconduct can be considered because the remaining members of the jury can testify as to whether or not those acts of misconduct actually occurred. *Id*. at 148-49. The Court recognized that, by drawing this distinction, verifiable evidence of a jury's consideration of extraneous prejudicial information could be considered by courts while still respecting the finality of jury verdicts by disallowing testimony as to the unverifiable thoughts of jurors.[6] *See id*. at 148-49.

Thus, the Supreme Court in *Mattox* held that, when addressing a motion for a new trial, courts should consider juror testimony concerning any overt acts of misconduct by which extraneous and potentially prejudicial information is presented to the jury, including juror testimony showing that a newspaper article relevant to the case was read aloud in the jury room. *See Mattox*, 146 U.S. at 148-49. The *Mattox* Court did not state, however, that courts should consider only

---

[6] Based on this distinction, we will not address Juror A's misconduct in looking up the definitions of "purposeful" and "intent" in a dictionary so that she could "clarify [her] understanding of those words." J.A. at 62-63 (Juror A Aff.). There is no evidence that Juror A informed other jurors about the definitions she had reviewed, and thus there is no "overt act" of misconduct that could be verified by the testimony of other jurors. *See Mattox*, 146 U.S. at 148-49.

those instances of misconduct in which there is inappropriate contact between the jury and a court official, or some other outside source. *See id*.

It is important to stress that we are not calling Doan's verdict into question by reviewing the private, internal deliberations of the jury. As the Supreme Court has noted, "substantial policy considerations," including the finality of verdicts and the avoidance of post-verdict juror harassment, weigh in favor of limiting the extent to which we delve into that thicket. *Tanner v. United States*, 483 U.S. 107, 119-21 (1987). Instead, what makes this case different, and what triggers concerns of a constitutional dimension, is the fact that Juror A conducted an out-of-court experiment and reported her findings to the jury in the manner of an expert witness. Unlike an expert witness, however, Juror A's testimony was not presented on the witness stand, nor was it subject to confrontation and cross-examination by Doan's attorneys. Juror A's testimony was not on the record, nor was it governed by the same evidence rules as all the other evidence presented at trial. In short, Juror A's experiment and her subsequent report of its results, results which indicated that Doan may not have been truthful in his testimony on the witness stand, injected extraneous and potentially prejudicial evidence into the jury's deliberations, evidence which Doan and his attorneys had no chance to refute.

A review of this misconduct stands in stark contrast to an examination of internal factors affecting the jury. Whether the jury understood the evidence presented at trial or the judge's instructions following the presentation of the evidence, whether a juror was pressured into arriving at a particular conclusion, and even whether jurors were intoxicated during deliberations, are all internal matters for which juror testimony may not be used to challenge a final verdict. *See Tanner*, 483 U.S. at 117-22, 125. For a juror to perform and report to other jurors the results of an out-of-court experiment, however, conflicts with Doan's constitutional right to a fair and impartial jury that considers only the evidence presented at trial.

The Sixth Amendment requires, "at the very least," that the evidence brought against a defendant and considered by the jury be presented at trial where the defendant can confront that evidence to the fullest extent possible. *Turner*, 379 U.S. at 472-73. Ohio Rule 606(B), by refusing to allow consideration of evidence of the improper juror experiment in this case, fails to protect adequately Doan's constitutional right to a fair trial. The state court's use of this rule to decide Doan's constitutional claim is "contrary to" clearly established Supreme Court precedent recognizing the fundamental importance of this right. *See Parker*, 385 U.S. at 364-65; *Turner*, 379 U.S. at 472-73.[7]

---

[7] Judge Suhrheinrich's concurring opinion contends that the Ohio Court of Appeals decision is not "contrary to" clearly established Supreme Court precedent because it did not reach a result opposite to Supreme Court precedent in a case with "materially indistinguishable" facts. *Williams*, 120 S. Ct. at 1519. However, the Supreme Court stated in *Williams* that there are two ways for a state court decision to be "contrary to" clearly established Supreme Court precedent. *See id*. First, "[a] state-court decision will certainly be contrary to our clearly established precedent if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases." *Id*. The Supreme Court then went on to explain that "[a] state-court decision will *also* be contrary to this Court's clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a [Supreme Court decision] and nevertheless arrives at a result different from our precedent." *Id*. (emphasis added). Thus, the Supreme Court noted, "in either of these two scenarios, a federal court will be unconstrained by § 2254(d)(1) because the state-court decision falls within that provision's 'contrary to' clause." *Id*.

We acknowledge today that, as a matter of law, clearly established Supreme Court precedent requires that a criminal defendant be afforded the right to confront the evidence and the witnesses against him, and the right to a jury that considers only the evidence presented at trial. *See Parker*, 385 U.S. at 364-65; *Turner*, 379 U.S. at 472-73. Regardless of any factual differences between this case and the relevant Supreme Court precedents, we hold that, as a matter of law, the state court's use of Ohio Evid. R. 606(B) in this case "contradicts the governing law set forth in" Supreme Court precedent recognizing the fundamental importance of Doan's constitutional right to confront the evidence and the witnesses against him.