United States Court of Appeals
Fifth Circuit

**F I L E D**

**July 29, 2005**

Charles R. Fulbruge III
Clerk

REVISED AUGUST 22, 2005

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

No. 03-11244

ROBERT MADRID SALAZAR

Petitioner - Appellant

v.

DOUG DRETKE, DIRECTOR, TEXAS DEPARTMENT OF CRIMINAL JUSTICE,
CORRECTIONAL INSTITUTIONS DIVISION

Respondent - Appellee

Appeal from the United States District Court
for the Northern District of Texas

Before KING, Chief Judge, and DeMOSS and STEWART, Circuit Judges.

KING, Chief Judge:

Petitioner-Appellant Robert Madrid Salazar appeals the
district court's dismissal of his 28 U.S.C. § 2254 habeas corpus
application. For the following reasons, we AFFIRM the judgment
of the district court.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. The Trial: Conviction and Sentencing

On April 30, 1997, Salazar was indicted for the capital
murder of his girlfriend's two-year-old daughter. He pleaded not
guilty, and on January 11, 1999, his trial began. The evidence

-1-

adduced at trial showed that Salazar began dating a woman named Raylene Blakeburn in the fall of 1996. On April 23, 1997, Blakeburn went to work in the morning, leaving her two-year-old daughter Adriana in Salazar's care as she often did. When Blakeburn came home from work at around 5:00 p.m., Salazar was not there. Blakeburn discovered Adriana in her bed, unconscious, breathing abnormally, and with blood in her mouth. With the assistance of a neighbor, Blakeburn called for an ambulance. When the paramedics arrived, they found Blakeburn standing outside of her house holding Adriana in a blanket. The paramedics were unable to bring Adriana back to consciousness, and they therefore placed her on a ventilator. One paramedic noticed that the back of Adriana's head had been caved in and that it felt like "Jello." The paramedics also observed that one of Adriana's arms was twisted and deformed and that she had marks and bruises covering her neck, ankles, and chest. Suspecting child abuse, the paramedics contacted the police. Adriana died at roughly 7:45 p.m.

Roger Torres, one of Salazar's friends, testified that at around 4:00 p.m. that day, he was walking home when Salazar drove up to him and asked if he could take a look at Salazar's fan belt. According to Torres, Adriana was not with Salazar at the time. Shortly thereafter, Torres examined the fan belt, and a little after 5:00 p.m., the two men drove to a nearby store and purchased some beer. At around this time, Torres noticed that

Salazar's shirt had on it a number of small stains, which appeared to be blood.  When the two men returned from the store, they saw the ambulance outside of Blakeburn's residence.  However, they did not stop, but rather drove by and continued on to Salazar's mother's house.  Once at his mother's house, Salazar changed his shirt and the two men drank some of the beer.  At this time, Blakeburn called Salazar at his mother's house and told him that Adriana was injured.  Salazar told Blakeburn not to tell the police that he had been watching Adriana that day.  He also told Torres to be quiet and that the matter was none of his business.

Salazar later gave a written statement to the police, in which he admitted that he had been watching Adriana while her mother was at work on the day in question.  He stated that he and Adriana were taking a shower together and that he became angry because she would not stop crying.[1]  Salazar also stated that in order to stop her crying, he pushed her with the back of his hand, causing her to fall down in the bathtub and hit her head.  Salazar stated that he became scared because Adriana was unconscious and bleeding, so he abandoned the child and left the scene.

The pathologist who performed the autopsy testified that Adriana's death was caused by trauma from multiple blunt force

---

[1]   Salazar stated that Adriana generally did not like to take a shower with him when her mother was not there.

injuries, and he ruled the manner of death a homicide.  The pathologist stated that the injuries sustained by Adriana were inconsistent with Salazar's contention that she had fallen down and hit her head in the tub.  Instead, Adriana's injuries indicated the infliction of repeated blows of severe force to her head, chest, and abdomen.  The autopsy revealed that the two-year-old had suffered at least three life-threatening injuries. All of these injuries were "acute," meaning they had been inflicted within forty-eight hours prior to the victim's death. One blow to her head resulted in a posterior basal skull fracture, consistent with her skull having been slammed into a hard surface.  The location of several other smaller skull fractures was consistent with her being struck multiple times, and the injuries to her eyes were consistent with being shaken or struck so hard that she would have been blind had she survived. A major blow to the chest bruised Adriana's lungs, diaphragm, and heart.  The pathologist testified that the injuries to the child's chest surpassed anything he had seen previously in cases of automobile accidents.  More than one of Adriana's ribs had been broken, and her heart was so severely damaged that it would have ruptured had she lived much longer.  The blow to her stomach had pushed her abdomen against her backbone, crushing the tissues in between.  The injuries to her tongue and mouth were indicative of a blow to her face, and the injury to her vagina was consistent with sexual penetration.

The prosecution also presented evidence at trial that in January 1997, Adriana suffered either a broken collar bone or a dislocated shoulder. When asked about the injury by a neighbor, Adriana replied that Salazar had done it. Lab analysis of a blood stain on the pants that Salazar was wearing on the day in question revealed that the stain was consistent with Adriana's DNA. On March 9, 1999, the jury found Salazar guilty of capital murder.

At sentencing, the State and Salazar each presented evidence with respect to the special issues submitted to the jury pursuant to TEX. CODE CRIM. PROC. ANN. art. 37.071 (i.e., future dangerousness and mitigating circumstances). In an attempt to show mitigating circumstances, Salazar presented evidence that he had been badly abused and neglected as a child. The State countered with evidence that Child Protective Services had intervened on his behalf. Moreover, the prosecution argued in closing that Salazar's childhood did not provide sufficient mitigating circumstances in light of, inter alia: (1) the heinous and brutal nature of the crime, including the likelihood that sexual assault had occurred; (2) the vulnerability of the victim due to her age and his position of trust in relation to her; (3) his attempt to cover up the crime and his continuing lack of remorse; and (4) evidence that he had a history of violence against the child.

In an effort to show a low probability of future

dangerousness, Salazar presented expert testimony of a clinical psychologist familiar with the Texas Department of Criminal Justice Institutional Division. The expert opined that if Salazar were sentenced to life in prison, he would be a candidate for administrative segregation, wherein he would pose a lesser danger to other inmates due to the increased level of supervision. However, the expert conceded that he could predict with near certainty that Salazar would commit additional violent offenses in the future if he were not imprisoned. The State also presented rebuttal evidence that although only 10-15% of the prison population is in administrative segregation, roughly 40% of the felony offenses committed in the prison occur in administrative segregation. In addition, the State presented evidence that Salazar had committed at least one minor theft and that he had been involved in a number of violent assault offenses, including an incident in which he choked the mother of his two children (a woman other than Blakeburn).

Salazar requested the trial court to instruct the jury that he would be eligible for parole after forty years if he received life in prison rather than death. At the time of Salazar's trial, Texas law provided that a criminal convict who is sentenced to life in prison will not be eligible for parole until he has served forty years. TEX. GOV'T CODE ANN. § 508.145(b) (Vernon 2003) ("An inmate serving a life sentence for a capital felony is not eligible for release on parole until the actual

calendar time the inmate has served, without consideration of good conduct time, equals 40 calendar years."). However, the trial court declined to give the instruction.[2] After the close of evidence and argument, the jury deliberated and answered the two special issues in favor of the death penalty (i.e., that Salazar presented a continuing threat to society and that there were insufficient mitigating circumstances to warrant life in prison rather than death). Consequently, the trial court sentenced Salazar to death.

## B. Motion for New Trial

After sentencing, television reporters interviewed at least one of the jurors, who revealed that during deliberations the jury discussed the possibility of parole if Salazar were sentenced to life in prison rather than death. In light of this discovery, Salazar filed a motion for a new trial, arguing, inter alia, that he had been denied a fair and impartial trial because one of the jurors, who professed to know the law of parole, asserted as fact a misstatement about parole law, and that misstatement was relied upon by one of the other jurors, who for

---

[2] Thus, the trial court did not specifically instruct the jury not to consider the possibility of parole in its deliberations. However, at the beginning of trial, the trial court did instruct the jury that "[a]ll evidence must be presented in open Court, so that each side may question the witness and make proper objections" and that "[t]his prevents a trial based upon secret evidence." Similarly, the jury charge instructed the jurors "not to refer to or discuss any matter or issue not in evidence before [them]."

that reason changed her vote to a harsher sentence.[3]  In a separately numbered paragraph, Salazar's motion advanced a similar claim, without citing any authority, that he was deprived of a fair and impartial trial because the jury "improperly discussed the effect the Parole Laws would have on the release of Defendant if assessed a life sentence by the jury."

On May 19, 1999, the state trial court conducted a hearing on Salazar's motion for a new trial.  At the hearing, Salazar sought to present live testimony from four of the jurors at Salazar's trial.  Before this evidence was introduced, however, the State informed the trial court that if any of the jurors were to testify as to discussions that occurred during the deliberations, it would object under TEX. R. EVID. 606(b).[4]

---

[3]     To support his claim, Salazar cited Sneed v. State, 670 S.W.2d 262, 266 (Tex. Crim. App. 1984) (en banc), in which the Texas Court of Criminal Appeals stated:

> To show that a jury's discussion of the parole law constitutes reversible error, it must be shown that there was[:] (1) a misstatement of the law[;] (2) asserted as a fact[;] (3) by one professing to know the law[;] (4) which is relied upon by other jurors[;] (5) who for that reason changed their vote to a harsher punishment.

(internal quotation marks omitted).

[4]     TEX. R. EVID. 606(b) provides:

> (b) Inquiry Into Validity of Verdict or Indictment.  Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the jury's deliberations, or to the effect of anything on any juror's mind or emotions or mental processes, as influencing any juror's assent to or dissent from the verdict or indictment.  Nor may a juror's affidavit or any statement by a juror concerning

Defense counsel requested that he be allowed to present the evidence under a bill of exception in the event that the court sustained the State's objection. The trial court sustained the prosecution's objection, concluding that Rule 606(b) rendered inadmissible the jurors' testimony as to their statements and discussions during deliberations and as to the effect of those discussions on their thought processes and decisions.[5] However,

any matter about which the juror would be precluded from testifying be admitted in evidence for any of these purposes. However, a juror may testify: (1) whether any outside influence was improperly brought to bear upon any juror; or (2) to rebut a claim that the juror was not qualified to serve.

FED. R. EVID. 606(b) is similar, but not identical, to TEX. R. EVID. 606(b). The federal rule provides:

(b) Inquiry into validity of verdict or indictment. Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes in connection therewith, except that a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror. Nor may a juror's affidavit or evidence of any statement by the juror concerning a matter about which the juror would be precluded from testifying be received for these purposes.

[5] We note that a number of Texas courts of appeals have concluded that the 1998 amendment of TEX. R. EVID. 606(b) abrogated the test for jury misconduct articulated in Sneed because the rule now bars the introduction of evidence necessary to satisfy the five-factor test. See Hart v. State, 15 S.W.3d 117, 123-24 (Tex.App.--Texarkana 2000, pet. ref'd) (explaining that the new rule limits jurors to "testifying only about outside influences that affected their decision or testimony rebutting a

as defense counsel requested, the court allowed the jurors'
testimony to be presented under a bill of exception.[6]  As
discussed in detail by the Texas Criminal Court of Appeals (the
"TCCA"), these jurors presented conflicting accounts as to what
occurred during deliberations regarding their discussion of
parole law.  See Salazar v. State, 38 S.W.3d 141, 146-47 (Tex.
Crim. App. 2001), cert. denied, 534 U.S. 855 (2001).

Defense counsel first called Juror Voyles to testify.
Voyles stated on direct examination that it became known to him
at some point during the trial or deliberations that another
juror, Juror Kelly, was a police officer.  Voyles stated that his
knowledge that Kelly was a police officer led him to believe that

---

claim that a juror was not qualified" and therefore prevents a
defendant from meeting the Sneed factors, which were developed
under a previous version of the rule that allowed jurors to
testify more broadly about the validity of the verdict) (quoting
TEX. R. EVID. 606(b)); see also Moore v. State, No.
12-01-00089-CR, 2002 WL 253818, *1-2 (Tex. App.--Tyler 2002, no
pet. h.) (per curiam) (not designated for publication); Hines v.
State, 3 S.W.3d 618, 620-23 (Tex. App.--Texarkana 1999, pet.
ref'd).  Indeed, the Texas Criminal Court of Appeals on Salazar's
direct appeal noted the apparent conflict between Texas Rule
606(b) and Sneed, but it declined to resolve the issue.  Salazar,
38 S.W.3d at 148 n.3.

[6]     The trial court stated:

Well, I have read 606(b).  If the testimony is going to
be as to any matter or statement occurring during the
course of the jury's deliberation or to the effect of
anything upon a juror's mind or emotions that is
influencing the juror or concerning the mental processes
in connection with it, then I will sustain the objection
to that kind of testimony.  I will permit you to put on
the evidence that you are offering as a bill of
exception.

-10-

Kelly had some special knowledge of the law. In response to defense counsel's question whether Kelly had professed to know the law of parole, Voyles indicated that during deliberations the jury discussed when Salazar would become eligible for parole, and that during this discussion, Kelly seemed very sure that Salazar would be eligible in twenty years if he were sentenced to life in prison. Voyles stated that he relied upon Kelly's statement but that he did not change his vote because of it. However, he then stated that if he had known that Salazar would not have been eligible for parole for forty years, he more likely would have leaned toward life, although he could not say whether that would have been his final decision.

Second, Juror Hamlin testified that he vaguely recalled the jury discussing the length of time that Salazar would spend in prison if he were sentenced to life, although he could not remember who initiated the discussion. Hamlin remembered hearing two different figures: twenty years and twenty-five years. Hamlin said he did not rely upon those figures, nor did they affect his vote.

Third, Juror Kelly testified that the other jurors learned that he was a police officer during the course of the trial. He also stated that the jurors discussed parole law during deliberations, and that he expressed his opinion as to the law. Kelly indicated that he could not remember with which of the jurors he discussed the matter. He recalled saying something to

-11-

the effect of "life doesn't mean life, that [a prisoner] can get out on parole," but he could not recall how many years he said a life-sentenced defendant must serve before becoming eligible for parole. On cross-examination, Kelly stated that some of the other jurors also expressed opinions as to the number of years that a life-sentenced prisoner must serve, and he testified that while the jurors discussed parole, he did not lead the conversation but rather "wanted to take a back seat." He further testified that he did not tell the other jurors that he had special expertise in parole law, nor did he hold himself out to be a legal expert.

Fourth, defense counsel called Juror Ashley to testify. On direct examination, Ashley stated that during deliberations she knew that Kelly was a police officer and that Kelly stated that he had a lot of experience in dealing with parole law. Ashley remembered Kelly asserting as fact that Salazar could be released on parole in as little as twenty years, and she stated that she relied upon Kelly's assertion. Finally, she said that her reliance affected her vote in as much as she was "holding out for life" up "into the fifth hour" until she heard Kelly's statements about parole.[7] Later on direct examination, Ashley addressed

---

[7] The exchange between defense counsel and Ashley in this regard went as follows:

Q. How did that reliance affect your vote?
A. Well, up into the fifth hour, I had decided life, but, as we were deliberating, and [Kelly] made the statements [about parole]

comments that she had made in a television interview, in which she stated that during deliberations, she was concerned that Salazar might be out in thirty or forty years. She explained that Kelly had told her and other jurors that Salazar could be paroled at some time between twenty and forty years. The prosecution cross-examined Ashley, pointing out that earlier she had testified that Kelly said that Salazar would be eligible for parole in twenty years. Ashley restated that Kelly had actually told them between twenty and forty years, and she agreed that during deliberations she really had no idea when Salazar would get out of prison. The State also questioned Ashley about a statement in her affidavit in which she stated that Kelly told them that Salazar would only go to administrative segregation if there was an opening. Ashley reaffirmed that statement and further stated that she changed her vote from life to death based on a combination of her concerns about parole and the uncertainty that Salazar would be placed in administrative segregation.[8]

---

> that he did, it helped cause me to change my
> mind from life to death.
> Q.   So were you, I guess for lack of a better
>       word, holding out for life up until you heard
>       that?
> A.   Uh-huh, yes.

[8]   On re-cross-examination, Ashley agreed that both administrative segregation and parole concerns motivated her to change her vote:

> Q.   It was a combination of all of those things that
>       you put in your affidavit; the thought that in 30
>       to 40 years, he was going to get out, and he would
>       be a more dangerous criminal, ad[ministrative]

In rebuttal, the State offered the affidavits of four other jurors. Juror Holdridge's affidavit stated that Kelly never "held himself out as an expert in the area of Parole laws." He further stated that any consideration of parole laws by the jurors focused on possibilities of what would happen on parole and how many years Salazar would serve before being released, but that no actual number of years was ever asserted as fact by any of the jurors.

Juror Stanford's affidavit also stated that Kelly "never held himself out as someone who knew" the parole law and that although Kelly participated in the discussions, he did not state his opinions as fact. The affidavit indicated that any discussion of parole centered around the fact that a life sentence left open the possibility that Salazar would be released at some time, regardless of exactly how many years it would take, and that the jury did not want him to get out of prison at any time.

The affidavits of Jurors Tinney and Perez were consistent with those of Holdridge and Stanford. Tinney's affidavit indicated that all of the jurors were concerned with whether Salazar would ever get out of prison, not with how many years it would be before he was paroled. Tinney's affidavit also stated

---

seg[regation], and parole. All of those things--
A.  Yes.
Q.  --influenced your verdict?
A.  Yes.

that Kelly "never said anything that because he was a police officer he knew what the law was or anything of that nature." Perez's affidavit similarly stated that Kelly never held himself out as an expert in the area of parole nor did Kelly claim to have special knowledge of parole law because he was a police officer. Perez's affidavit further asserted that Kelly did not overtly attempt to influence other jurors and that Kelly was one of the last jurors to vote in favor of death.

When the State offered the affidavits into evidence, defense counsel raised its own objection under TEX. R. EVID. 606(b). In response, the prosecution informed the court that it had decided to withdraw its Rule 606(b) objection to the defense's evidence, and it asked the court to make a ruling on the motion for new trial based on the evidence presented at the hearing. Defense counsel subsequently agreed to withdraw its Rule 606(b) objection, leaving the court free to consider the above-described testimony and affidavits of the jurors.[9] Based on this evidence, the state trial court ruled from the bench and denied Salazar's motion for a new trial.[10]

---

[9] Before resting at the hearing, the prosecution requested the trial court to take judicial notice of the fact that there was not a specific instruction given to the jury regarding parole, which the court did.

[10] Specifically, the trial court stated: "[T]he rule says that the Court has to rule without summarizing the evidence or making any comment. So the Court is going to overrule the motion for new trial, with the one statement that the Court has taken into consideration the test in the Sneed case." Thus, contrary to the view of the district court below, the trial court did not

-15-

## C.  Direct Appeal

Salazar appealed to the TCCA, arguing, inter alia, that "the trial court erred in denying him a new trial because the jury's extrinsic-to-the-record discussion of inaccurate parole information during punishment deliberations constituted jury misconduct under state law" and deprived him of: (1) a fair trial by an impartial jury under the Sixth Amendment; (2) due process under the Fourteenth Amendment; and (3) his rights under the Texas Constitution.  Salazar, 38 S.W.3d at 146-47.  The TCCA rejected these contentions and affirmed Salazar's conviction and death sentence.  The TCCA dismissed Salazar's federal and state constitutional claims based on the jury's discussion of parole because Salazar's "brief present[ed] no authority in support of his argument . . . ."  Salazar, 38 S.W.3d at 147.  In addressing Salazar's state law claim of jury misconduct, the TCCA noted that it deferentially reviewed the trial court's ruling for an abuse of discretion.[11]  After discussing in detail the testimony and

articulate any specific fact findings with respect to any of the particular Sneed factors.

[11]     The TCCA explained:

A trial court's ruling denying a defendant's motion for new trial is reviewed under an abuse of discretion standard.  We do not substitute our judgment for that of the trial court, but simply determine whether the trial court's Sneed analysis was arbitrary or unreasonable. The trial court is the sole judge of the credibility of the testifying jurors.  Where there is conflicting evidence on an issue of fact as to jury misconduct, the trial judge determines the issue and there is no abuse of discretion in overruling the motion for new trial.

affidavits presented at the hearing on the motion for a new trial, the TCCA determined that the evidence was conflicting on a number of the Sneed factors.[12]  Accordingly, it concluded that the district court did not abuse its discretion in finding that Salazar had failed to satisfy the elements of a state-law jury misconduct claim under Sneed.

**D.  State and Federal Habeas**

On October 13, 2000, while his direct appeal to the TCCA was

---

Salazar, 38 S.W.3d at 148 (internal citation omitted).

[12]    Specifically, the TCCA stated:

There are a number of discrepancies between the various jurors' testimony and affidavits as to what went on during deliberations.  There is no consensus regarding whether Kelly actually held himself out as an expert on parole law and represented to the other jurors, as a fact, that appellant would be released on parole in 20 years if he were to receive a life sentence.  A number of the affidavits state that Kelly only provided an opinion on the general issue of parole during discussion with the other jurors.  This is "conflicting evidence on an issue of fact," and any decision as to credibility of the jurors' testimony is left to the trial judge.
    In addition to disagreement between the jurors as to what went on during deliberations, Ashley's own testimony is inconsistent concerning how her vote was affected by Kelly's discussion of parole laws.  On direct examination, she stated that she voted for the death penalty over life imprisonment because of Kelly's statements that appellant could be released on parole in 20 years, but on cross examination, she admitted that a number of factors contributed to her decision, including testimony concerning administrative segregation and the belief that the defendant might be released in 20 to 40 years.  This is conflicting evidence on an issue of fact, which, again, is decided by the trial judge.

Salazar, 38 S.W.3d at 149 (internal citation omitted).

still pending, Salazar filed a petition for a writ of habeas corpus in state court, arguing, inter alia, that the jury's discussion of parole denied him his right to due process of law because the information had not been adduced at trial.[13]  On April 23, 2001, the trial court (the same court that had presided over Salazar's trial, sentencing, and motion for a new trial) adopted the State's proposed findings of fact and conclusions of law, and it recommended to the TCCA that relief be denied.[14]  The TCCA, in turn, adopted the trial court's findings and conclusions and denied Salazar's habeas petition on June 6, 2001.  Ex Parte Salazar, No. 49,210-01 (Tex. Crim. App. 2001) (unpublished).

On September 6, 2002, Salazar filed a petition for habeas relief in federal district court.  Salazar argued, inter alia, that his due process rights were violated by the jury's

---

[13]    Salazar's state habeas application recounted Salazar's claim that Kelly had misinformed the other jurors about the number of years a life-sentenced prisoner must serve before becoming eligible for parole.  The application stated that this misinformation "deprived [Salazar] of his protection under due process of law."  Salazar's application continued:

A jury may base[] its decision only upon evidence placed before it by counsel for either side.  When a decision is made upon information not adduced as evidence, the jury defies due process of law.
It is clear that the Texas Rules of Evidence render a juror's statements about what occurred during deliberations incompetent evidence.  To the extent, however, that the rules prevent the vindication of a due process right, the rules themselves violate due process of law.

[14]    The state habeas trial court's findings and conclusions are discussed in detail below.

-18-

discussion of inaccurate information about Texas parole law during its deliberations.[15] On August 27, 2003, without holding an evidentiary hearing,[16] the district court denied Salazar's habeas petition. The district court reasoned that Salazar "failed to rebut the presumption of correctness that attached to the state court finding that even if there was jury misconduct, there was insufficient evidence that it affected juror impartiality . . . ." Therefore, the court concluded that Salazar "failed to show that the state court's adjudication of the jury misconduct claim was contrary to or an unreasonable application of clearly established federal law."

On September 11, 2003, Salazar filed a motion under FED. R. CIV. P. 59, requesting that the district court reconsider its judgment. On October 27, 2003, the district court denied

---

[15] Salazar's federal habeas petition repeated his jury misconduct argument verbatim from his state habeas application, with the exception that his federal petition did not include the last two sentences from the state application, which read: "It is clear that the Texas Rules of Evidence render a juror's statements about what occurred during deliberations incompetent evidence. To the extent, however, that the rules prevent the vindication of a due process right, the rules themselves violate due process of law."

[16] Salazar has not argued in any of his briefing to this court that the district court erred by not conducting an evidentiary hearing, nor did he argue that he was prevented from introducing any evidence at the state court hearing that would have supported his federal claim beyond the testimony that he was allowed to introduce under the bill of exception. Therefore, any such argument, to the extent that defense counsel may have raised it at oral argument, has been forfeited. See, e.g., Tenny v. Dretke, No. 04-50468, 2005 WL 1581077, *3 & n.20 (5th Cir. July 7, 2005).

Salazar's motion.

Salazar filed a notice of appeal and a motion for a certificate of appealability ("COA") under 28 U.S.C. § 2253(c)(1), which the district court denied. This court, however, granted Salazar's request for a COA on his claim regarding statements about parole law made by certain jurors during deliberations. See Salazar v. Dretke, No. 03-11244, 116 Fed. Appx. 532 (5th Cir. Nov. 30, 2004) (per curiam) (unpublished).

## II. DISCUSSION

### A. Standard of Review

This habeas proceeding is governed by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) because Salazar filed his § 2254 habeas petition on September 6, 2002, well after AEDPA's effective date of April 24, 1996. See Fisher v. Johnson, 174 F.3d 710, 711 (5th Cir. 1999). This court has jurisdiction to resolve the merits of Salazar's habeas petition because, as stated above, we previously granted him a COA. See Salazar, 116 Fed. Appx. at 537; see also 28 U.S.C. § 2253(c)(1); Miller-El v. Cockrell, 537 U.S. 322, 336 (2003) (explaining that a COA is a "jurisdictional prerequisite" without which "federal courts of appeals lack jurisdiction to rule on the merits of appeals from habeas petitioners").

We review de novo the district court's grant of summary judgment denying a state petitioner's request for habeas relief.

-20-

Ogan v. Cockrell, 297 F.3d 349, 355-56 (5th Cir. 2002); Fisher v. Texas, 169 F.3d 295, 299 (5th Cir. 1999). We may affirm a grant of summary judgment on any ground supported by the record, even if it is different from that relied upon by the district court. Holtzclaw v. DSC Communications Corp., 255 F.3d 254, 258 (5th Cir. 2001). We review the district court's conclusions of law de novo and its findings of fact, if any, for clear error. Collier v. Cockrell, 300 F.3d 577, 582 (5th Cir. 2002).

Under AEDPA, a federal court may not grant a writ of habeas corpus "with respect to any claim that was adjudicated on the merits in State court proceedings" unless the petitioner shows that the state court's adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."[17] 28 U.S.C. § 2254(d)(1) (emphasis added);[18] Williams v. Taylor, 529 U.S. 362, 402-13 (2000). Thus,

---

[17] A writ of habeas corpus may issue also if the state court's adjudication of a claim "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). Salazar, however, does not argue that he is entitled to relief under § 2254(d)(2).

[18] 28 U.S.C. § 2254(d) provides in full:

(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--
    (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly

a threshold question regarding whether to apply the deferential standard of review set forth in § 2254(d)(1) is whether Salazar's federal constitutional claim relating to the jury's discussion of parole was "adjudicated on the merits in State court proceedings" as contemplated by AEDPA.  <u>Fisher</u>, 169 F.3d at 299.  "In this circuit, the question of whether a state court's decision is an adjudication on the merits turns on 'the court's disposition of the case--whether substantive or procedural.'"  <u>Mercadel v. Cain</u>, 179 F.3d 271, 274 (5th Cir. 1999) (per curiam) (quoting <u>Green v. Johnson</u>, 116 F.3d 1115, 1121 (5th Cir. 1997)); <u>accord</u> <u>Neal v. Puckett</u>, 286 F.3d 230, 235 (5th Cir. 2002) (per curiam) (en banc) ("In the context of federal habeas proceedings, adjudication 'on the merits' is a term of art that refers to whether a court's disposition of the case was substantive as opposed to procedural.").

Salazar argues that the deferential scheme of § 2254(d)(1) is inapplicable because his constitutional claim was not "adjudicated on the merits" by any state court.[19]  The State

---

established Federal law, as determined by the Supreme Court of the United States; or
(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

[19]  As Salazar correctly notes, if the federal claim was not adjudicated on the merits in the state courts, we would review the claim de novo rather than under the deferential standard set forth in § 2254(d)(1).  <u>See, e.g.</u>, <u>Miller v. Johnson</u>, 200 F.3d 274, 281 n.4 (5th Cir. 2000).

-22-

concedes that the TCCA did not address the merits of his federal constitutional claim on direct appeal. Rather, the TCCA on direct appeal expressly refused to consider the substance of the constitutional claim, disposing of it on the procedural ground that it had been inadequately briefed.[20] See Salazar, 38 S.W.3d at 147. The pertinent question, therefore, is whether the state habeas courts adjudicated Salazar's federal constitutional claim on the merits. The last court to address Salazar's state habeas application was the TCCA. In its order denying habeas relief, the TCCA adopted the state habeas trial court's findings of fact and conclusions of law, and it stated that based on those findings and conclusions, as well as its own review, Salazar's application was denied. Hence, to determine whether Salazar's federal due process claim was adjudicated on the merits, we look through to the state habeas trial court's resolution of Salazar's application. See Jackson v. Johnson, 194 F.3d 641, 651 (5th Cir. 1999) (noting that the federal habeas court should "look through"

---

[20] Despite the TCCA's procedural disposition, the State did not invoke the procedural bar doctrine in the state habeas proceeding. Furthermore, in response to Salazar's federal habeas petition in the district court, the State did not argue procedural bar in its motion for summary judgment. Nor did it argue that an adequate and independent state law ground supported the habeas court's ruling. Subsequently, the State attempted to raise a procedural bar argument in the district court at the hearing on the motion for summary judgment. The district court, however, concluded that the State had already waived the argument, and the court therefore reached the merits of Salazar's constitutional claim. The State has abandoned its procedural bar argument on appeal to this court, and we decline to raise the issue sua sponte. See Fisher, 169 F.3d at 300-02.

-23-

to the last clear state decision on the matter).

The state habeas trial court's findings and conclusions indicate that the court recommended that the TCCA dismiss or deny relief for four reasons. First, the state habeas trial court found that all of the evidence upon which Salazar relied to support his claim of jury misconduct was barred from the state court's consideration by TEX. R. EVID. 606(b). Furthermore, although Salazar contended that TEX. R. EVID. 606(b) violated his right to due process, the court found that the constitutionality of the state rule of evidence, as well as its federal counterpart, had been upheld by a number of other courts.[21] Second, the state habeas trial court found that Salazar had not shown that "the jury's discussion of parole was so detrimental as to deprive Applicant of a fair and impartial trial." In coming to this conclusion, the court relied entirely upon the state-law Sneed factors for assessing jury misconduct, without mentioning

---

[21]    Specifically, the state habeas court concluded:

Applicant claims that his due process rights were violated due to misinformation given to the jury by a jury member regarding parole eligibility. The State has invoked [TEX. R. EVID.] 606(b). Applicant concedes that [Rule] 606(b) prohibits a juror from testifying regarding juror deliberations. Yet, Applicant contends that [Rule] 606(b) violates due process of law. However, several appellate courts have upheld the constitutionality of [TEX. R. EVID.] 606(b) and its federal counterpart. See[,] e.g.[,] Tanner v. United States, 483 U.S. 107, 125-27 (1987) . . . . Therefore, this Court recommends that Applicant's claim of jury misconduct be dismissed or denied.

-24-

federal law.[22]  Third, the court stated that Salazar's claim of jury misconduct had already been fully litigated and that the law of the case therefore barred re-litigation of the issue.  Fourth, and finally, the court stated that Salazar's "claim of jury misconduct does not establish a constitutional violation that is cognizable in a writ of habeas corpus proceeding."

Salazar argues that none of these four reasons provided by the state habeas court for denying his claim constituted an adjudication of his federal constitutional claim on the merits. He argues that, of the four above-described reasons, only the second reason can be construed as a merits determination-- according to Salazar, the other three are procedural dispositions.  Moreover, Salazar contends that the second reason,

_____

[22]   In this regard, the state habeas court stated:

> Furthermore, Applicant has not established that the jury's discussion of parole was so detrimental as to deprive Applicant of a fair and impartial trial.  In order to show reversible error based on improper jury discussion of parole, Applicant must prove to the trial court the existence of the following factors: 1) a misstatement of the law; 2) asserted as fact; 3) by one professing to know the law; 4) which is relied upon by other jurors; and 5) who for that reason changed their vote to a harsher punishment. Sneed v. State, 670 S.W.2d 262, 266 (Tex. Crim. App. 1984) . . . .
> At the hearing o[n] his motion for new trial, Applicant attempted to satisfy the Sneed factors through the testimony of jurors concerning their discussions during deliberation.  In a credibility determination, the trial court found that Applicant was unsuccessful in satisfying these factors.  Thus, Applicant has failed to establish detrimental jury misconduct.  Therefore, this Court recommends that Applicant's claim of jury misconduct be dismissed or denied.

even if a merits determination, is insufficient to trigger the deferential standard of review set forth in § 2254(d) because it did not address his federal constitutional claim that his due process rights were violated, but rather only his state-law claim under Sneed.

At oral argument, the State seemingly conceded that the state habeas court's second, third, and fourth conclusions addressed only the state-law Sneed claim and not the federal constitutional claim.[23] However, the State argued that the state habeas court's second reason fairly could be construed as an adjudication of the federal constitutional claim. In that aspect of its conclusions, the state court reasoned that, in light of the evidence presented at the hearing on the motion for a new trial, Salazar had not shown that the jury's discussion of parole deprived Salazar of a fair and impartial trial. According to the

_____

[23] The state habeas court's conclusions in this regard, are especially puzzling because Salazar's state habeas petition did not raise a state-law Sneed claim; it raised only a "due process" claim. Nevertheless, the State's concession appears to be an accurate characterization of the state habeas trial court's conclusions. The state court's second reason for recommending the denial of Salazar's jury misconduct claim (i.e., that Salazar had not been denied a fair and impartial trial) explicitly analyzed the jury's discussion of parole under the Sneed factors. The third reason, that the issue had been fully litigated on direct appeal and that the law of the case controlled, clearly spoke to the state-law claim--the Sneed claim was fully litigated on direct appeal, but the constitutional claims were dismissed on procedural grounds. The fourth reason, that the claim was not a constitutional violation cognizable on habeas, most likely addressed only the Sneed claim under the principle that non-constitutional claims are generally not cognizable on state habeas. See Taylor v. State, 10 S.W.3d 673, 681 (Tex. Crim. App. 2000).

State, although the state court analyzed the issue purely in terms of state law, the substance of the state law and federal constitutional claims, which both related to the effect of the parole-related statements on Salazar's right to a fair and impartial trial, were sufficiently similar such that this determination substantively resolved the merits of the federal claim as well as the state-law claim.[24]  Salazar counters that the two claims were not sufficiently similar because the Texas law Sneed test is grounded entirely in state statutory concerns and not constitutional due process concerns.  Therefore, according to Salazar, the state habeas court's adjudication of the Sneed claim cannot be characterized as an adjudication of his federal constitutional claim on the merits.

However, we need not reach the question whether the state court's disposition of Salazar's state-law Sneed claim sufficiently adjudicated his federal due process claim such that § 2254(d) applies.  Instead, we conclude that the state habeas

---

[24]     Although the question has not been addressed in this circuit, we note that some support exists for the State's position that a state habeas court's adjudication of a state law claim that is similar to a federal constitutional claim may constitute an adjudication on the merits under § 2254(d).  See Early v. Packer, 537 U.S. 3, 8 (2002) (per curiam) (stating that the federal court of appeals correctly determined that the relevant claim had been rejected on the merits by the state habeas court and that § 2254(d)(1) therefore applied, despite the fact that the state court relied exclusively on state law in addressing the claim); Cox v. Burger, 398 F.3d 1025, 1029-30 (8th Cir. 2005) (concluding that the state habeas court "effectively adjudicated" the petitioner's federal constitutional claim on the merits through its analysis of state law (citing Early, 537 U.S. at 8)).

trial court effectively adjudicated Salazar's federal claim on the merits when it concluded that the State's invocation of TEX. R. EVID. 606(b) left Salazar with no admissible evidence to support his due process claim and that the application of Texas Rule 606(b) in this context was constitutional under, inter alia, Supreme Court precedent. Salazar concedes that the state habeas court's conclusion with respect to Texas Rule 606(b) did in fact address his federal constitutional claim as opposed to his state-law Sneed claim.[25] Nevertheless, Salazar asserts a conclusory argument that this was a procedural disposition and not an adjudication on the merits. We disagree. In addressing the due process claim, the state habeas court applied Texas Rule 606(b) and determined that Salazar had presented no admissible evidence to support his claim.[26] It further held that the application of Texas Rule 606(b) did not violate Salazar's due process rights under, inter alia, the Supreme Court's decision in Tanner v. United States, 483 U.S. 107, 125-27 (1987). The state habeas court's ruling, therefore, was not a procedural ruling in which

---

[25]    Indeed, Salazar strenuously argues that Sneed and its progeny are wholly unrelated to due process considerations and are instead based entirely on state statutory grounds. Thus, according to his own position, the state habeas court's application of Texas Rule 606(b) to his "due process" claim must have addressed his federal claim, not his Sneed claim.

[26]    We note that Salazar has never contended that it was improper for the state habeas court to apply Rule 606(b) in light of the State's waiver of its objection at the hearing on the motion for a new trial. We therefore do not address any such argument.

the court dismissed Salazar's claim as improperly before the court. Rather, the state court's decision was a substantive determination that Salazar's claim was unsupported by any evidence and that Salazar's due process rights had not been violated.

Given our ability to reach this conclusion from the reasons set forth by the state habeas court, we need not analyze the question under the three-factor <u>Green</u> test that we have often employed to determine whether a state court's perfunctory disposition of a habeas application constituted an adjudication on the merits. See <u>Neal</u>, 286 F.3d at 235 (concluding that the state courts adjudicated the federal claim on the merits without resorting to the <u>Green</u> test); <u>Trevino v. Johnson</u>, 168 F.3d 173, 181 (5th Cir. 1999); <u>see also</u> <u>Green</u>, 116 F.3d at 1121 (setting forth the three-factor test to determine whether a state court's perfunctory disposition of a state habeas petition was a "resolution on the merits," which was the pre-AEDPA equivalent of an "adjudication on the merits").[27]  However, we note that our

---

[27]  In <u>Green</u>, 116 F.3d at 1121, this court set forth a three-factor test, asking:

(1) what the state courts have done in similar cases; (2) whether the history of the case suggests that the state court was aware of any ground for not adjudicating the case on the merits; and (3) whether the state courts' opinions suggest reliance upon procedural grounds rather than a determination of the merits.

See also <u>Mercadel</u>, 179 F.3d at 274 (applying three-factor test from <u>Green</u> to determine whether state court's one-word disposition of a state habeas petition was an adjudication on the

conclusion is supported by the fact that the TCCA denied, rather than dismissed, Salazar's state habeas application.  Under Texas law, a denial of a habeas petition, as opposed to a dismissal, suggests that the state court adjudicated the claim on the merits.  See, e.g., Ex Parte Grigsby, 137 S.W.3d 673, 674 (Tex. Crim. App. 2004); Ex Parte Torres, 943 S.W.2d 469, 472 (Tex. Crim. App. 1997) ("In our writ jurisprudence, a 'denial' signifies that we addressed and rejected the merits of a particular claim while a 'dismissal' means that we declined to consider the claim for reasons unrelated to the claim's merits."); see also Henderson v. Cockrell, 333 F.3d 592, 598 (5th Cir. 2003).  Thus, we are satisfied that Salazar's federal constitutional claim was adjudicated on the merits such that our review is controlled by § 2254(d)(1).

**B.  Analysis**

Section 2254(d)(1) precludes habeas relief on a "claim that was adjudicated on the merits in State court proceedings" unless the petitioner shows that the adjudication of the claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law as determined by the Supreme Court of the United States . . . ."  28 U.S.C. § 2254.  "For purposes of 28 U.S.C. § 2254(d)(1), clearly established law as determined by [the Supreme] Court 'refers to

---

merits under AEDPA); Jackson, 194 F.3d at 650-51.

-30-

the holdings, as opposed to the dicta, of th[e] Court's decisions as of the time of the relevant state-court decision.'" Yarborough v. Alvarado, 541 U.S. 652, 660-61 (2004) (quoting Williams, 529 U.S. at 412). "We look for 'the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision.'" Id. at 661 (quoting Lockyer v. Andrade, 538 U.S. 63, 71 (2003)). Moreover, a decision by this court or one of our sister circuits, even if compelling and well-reasoned, cannot satisfy the clearly established federal law requirement under § 2254(d)(1). Burgess v. Dretke, 350 F.3d 461, 469 (5th Cir. 2003).

A state-court decision is contrary to clearly established Supreme Court precedent if the state court applies a rule that contradicts the governing law set forth in the Supreme Court's cases or confronts a set of facts that are materially indistinguishable from a decision of the Court and nevertheless arrives at a different result. Williams, 529 U.S. at 405-06, 413. A state-court decision involves an unreasonable application of clearly established Supreme Court law if the state court unreasonably applies the correct governing legal principle from the Supreme Court's decisions to the facts of the case. Id. at 413. It is not enough for the state court's application of federal law to be incorrect or erroneous; rather, "[t]he state court's application of clearly established law must be objectively unreasonable." Andrade, 538 U.S. at 75; accord

-31-

<u>Yarborough</u>, 541 U.S. at 665; <u>Woodford v. Visciotti</u>, 537 U.S. 19, 24-25 (2002) (per curiam); <u>Williams</u>, 529 U.S. at 409-10.

Applying the standard set forth in § 2254(d), we find that Salazar is not entitled to habeas relief. The state habeas court's adjudication of his due process claim was not contrary to, or an unreasonable application of, clearly established federal law as determined by the Supreme Court. No clearly established Supreme Court authority holds that a defendant is entitled to a new trial when one juror misstates the law of parole to other jurors during deliberations, nor does any Supreme Court precedent obligate a state court to admit testimony from jurors concerning their internal discussions about parole law during deliberations.[28] In fact, the existing clearly

---

[28]     As noted above, Salazar conceded in his state habeas petition that TEX. R. EVID. 606(b) precluded relief on his due process claim by rendering incompetent all of the evidence he presented in support of his claim. He also argued that, by preventing the vindication of his due process right, the application of Texas Rule 606(b) itself violated his due process rights. As also noted above, Salazar's federal habeas petition, although virtually identical to his state habeas application, did not repeat his assertion that the state court's application of Texas Rule 606(b) violated his due process rights. Regardless, we must consider the effect of the state court's conclusion that Salazar's claim failed on the merits because he presented no admissible evidence under TEX. R. EVID. 606(b) to support his claim.

Moreover, although we recognize that FED. R. EVID. 1101(e) provides that the Federal Rules of Evidence apply to § 2254 habeas corpus proceedings, we focus on TEX. R. EVID. 606(b) in our disposition of Salazar's claim because the state court decision that we review under § 2254 relied upon that rule in its adjudication of Salazar's claim, and because the district court neither held an evidentiary hearing nor received affidavits not in the state court record. <u>See</u> <u>Doan v. Brigano</u>, 237 F.3d 722, 734 n.8 (6th Cir. 2001), <u>abrogation on other grounds recognized</u>

established Supreme Court case law suggests the opposite.

As the Supreme Court explained in <u>Tanner</u>:

By the beginning of [the twentieth] century, if not earlier, the near-universal and firmly established common-law rule in the United States flatly prohibited the admission of juror testimony to impeach a jury verdict. . . . Exceptions to the common-law rule were recognized only in situations in which an "extraneous influence" was alleged to have affected the jury.

483 U.S. at 117 (quoting <u>Mattox v. United States</u>, 146 U.S. 140, 149 (1892)) (internal citations omitted). Examples of Supreme Court cases applying the common law exception for extraneous influences include <u>Mattox</u>, in which the Supreme Court held admissible the testimony of jurors that during deliberations one of the bailiffs in charge of the jury told them that the defendant had murdered other victims before and testimony that the jurors had read a newspaper article during deliberations characterizing the evidence against the defendant as exceptionally strong. <u>See</u> <u>Mattox</u>, 146 U.S. at 142-43, 149. The <u>Mattox</u> Court stated that "a juryman may testify to any facts bearing upon the question of the existence of any extraneous influence, although not as to how far that influence operated

---

by <u>Maples v. Stegall</u>, 340 F.3d 433, 437 (6th Cir. 2003) ("In light of the deference to state proceedings called for by AEDPA, it seems strange indeed that a federal habeas court would apply its own rules of evidence despite a conflicting state rule when it is simply reviewing the state court record in making its determination, rather than holding an evidentiary hearing in federal court."); <u>see also</u> <u>Loliscio v. Goord</u>, 263 F.3d 178, 186-88 (2d Cir. 2001) (noting the apparent tension between the deference afforded to state courts under AEDPA and the application of FED. R. EVID. 606(b) in reviewing a state court record).

upon his mind." Id. at 149.  Similarly, in Parker v. Gladden, 385 U.S. 363 (1966) (per curiam), the Supreme Court considered testimony that some of the jurors overheard a bailiff's comments that the defendant was a wicked, guilty man and that if there was anything wrong with convicting the defendant, the Supreme Court would correct it.  Although the Court did not directly address the admissibility of the juror testimony, it noted that the bailiff's "expressions were private talk, tending to reach the jury by outside influence."  Parker, 385 U.S. at 364 (internal quotation marks omitted); see also Remmer v. United States, 347 U.S. 227, 228-30 (1954) (considering testimony from a juror that he was offered a bribe by an unnamed third party).

The Tanner Court further explained that in situations not falling within the exception for external influences, the Supreme Court has "adhered to the common-law rule against admitting juror testimony to impeach a verdict."  Tanner, 483 U.S. at 117.  For example, in Hyde v. United States, 225 U.S. 347, 384 (1912), the Supreme Court decided that the applicable legal rule prevented the consideration of juror testimony that a bargain had been struck between the jurors during deliberations to convict one defendant in exchange for acquitting another.  Similarly, in McDonald v. Pless, 238 U.S. 264, 267 (1915), the Court concluded that juror testimony that the jury had rendered a quotient verdict was inadmissible for the purpose of impeaching that

-34-

verdict.[29]  The McDonald Court recognized that two competing

interests were at stake--the defendant's interest in a fair trial

and the public's interest in maintaining a working jury trial

system.  McDonald, 238 U.S. at 267.  The Court concluded that, in

the case of juror testimony about internal jury deliberations,

the interest in protecting the jury system was overriding:

> [L]et it once be established that verdicts solemnly made
> and publicly returned into court can be attacked and set
> aside on the testimony of those who took part in their
> publication and all verdicts could be, and many would be,
> followed by an inquiry in the hope of discovering
> something which might invalidate the finding. Jurors
> would be harassed and beset by the defeated party in an
> effort to secure from them evidence of facts which might
> establish misconduct sufficient to set aside a verdict.
> If evidence thus secured could be thus used, the result
> would be to make what was intended to be a private
> deliberation,     the     constant     subject     of     public
> investigation; to the destruction of all frankness and
> freedom of discussion and conference.

Id.

In Tanner, the Supreme Court concluded that FED. R. EVID.

606(b) rendered inadmissible jurors' testimony that other jurors

had consumed alcohol and illegal drugs during the trial, and it

noted that the rule "is grounded in the common-law rule against

the admission of jury testimony to impeach a verdict and the

exception for juror testimony relating to extraneous influences."

483 U.S. at 121-26.  The Tanner Court reaffirmed the legal

---

[29]     The verdict in McDonald was a quotient verdict in that
the jurors, unable to agree on the amount of damages, decided to
have each juror submit his desired amount, the amounts were added
together, and the sum was divided by the number of jurors,
resulting in the amount of damages awarded to the plaintiff.  238
U.S. at 265-66.

-35-

principle from McDonald in defense of the exclusion of the juror testimony:

> There is little doubt that postverdict investigation into juror misconduct would in some instances lead to the invalidation of verdicts reached after irresponsible or improper juror behavior. It is not at all clear, however, that the jury system could survive such efforts to perfect it. Allegations of juror misconduct, incompetency, or inattentiveness, raised for the first time days, weeks, or months after the verdict, seriously disrupt the finality of the process. Moreover, full and frank discussion in the jury room, jurors' willingness to return an unpopular verdict, and the community's trust in a system that relies on the decisions of laypeople would all be undermined by a barrage of postverdict scrutiny of juror conduct.

Id. at 120 (internal citation omitted). The Court concluded that the exclusion of the juror testimony did not violate the defendant's right to a fair and impartial trial in light of the "long-recognized and very substantial concerns support[ing] the protection of jury deliberations from intrusive inquiry." Id. at 127. Moreover, the Court reasoned that defendants' rights are sufficiently protected by a number of other safeguards in the trial process, including examination of the jurors during voir dire, the ability of jurors to report misconduct prior to rendering a verdict, and the evidence other than juror testimony. Id. at 127. Thus, the Court held that the application of FED. R. EVID. 606(b) to bar the jurors' testimony did not violate constitutional principles.

At oral argument in the present case, defense counsel contended that Tanner is not dispositive of Salazar's due process

claim because Tanner relied upon the distinction between juror testimony of objective jury misconduct and testimony concerning the subjective thought processes of the jurors. Counsel stated that testimony relating to objective jury misconduct is always admissible under federal law to impeach a verdict, whereas testimony about the jurors' subjective thought processes is inadmissible under the federal rule. Defense counsel further contended that Tanner is inapposite because, unlike federal law, Texas law does not recognize this distinction between objective misconduct and subjective mental processes but rather excludes all juror testimony, whether it pertains to objective facts or subjective thought processes. Defense counsel's contention, however, is incorrect for a number of reasons. First, and most important, Tanner clearly did not turn on a distinction between objective misconduct and subjective juror thought processes. In fact, Tanner dealt specifically with, and upheld the exclusion of, juror testimony concerning objective misconduct (i.e., the consumption of alcohol and illicit substances); it simply did not involve testimony concerning the jurors' subjective thought processes or the effect of anything on their decision in reaching their verdict. See id. at 118-20. Contrary to defense counsel's argument, the Court made clear in Tanner that not all evidence of objective misconduct occurring during juror deliberations is admissible under FED. R. EVID. 606(b), and it held that the exclusion of juror testimony about the jury's internal

-37-

deliberations is not only constitutionally permissible but is also likely necessary to preserve the vitality of our jury system. Id. at 120, 126-27; see also Anderson v. Miller, 346 F.3d 315, 325-26 (2d Cir. 2003) (discussing the centrality of the jury to our justice system). Second, defense counsel misconstrued the difference between the federal rule and the Texas rule by stating that Texas law does not recognize the distinction made in federal law between juror testimony concerning objective misconduct and testimony concerning jurors' subjective thought processes. In fact, the Texas rule includes language virtually identical to the federal rule, providing that: "a juror may not testify as to . . . the effect of anything on any juror's mind or emotions or mental processes, as influencing any juror's assent to or dissent from the verdict or indictment." TEX. R. EVID. 606(b). Thus, both FED. R. EVID. 606(b) and TEX. R. EVID. 606(b) bar all juror testimony concerning the jurors' subjective thought processes.[30] Accordingly, Salazar's attempt

---

[30] Of course, the difference between the federal rule and the Texas rule relates to the admissibility of juror testimony about objective misconduct. Both rules generally prohibit juror testimony about any matter or statement occurring during the jury's deliberations, but each rule provides an exception to that rule. The Texas rule allows jurors to testify only about "whether any outside influence was improperly brought to bear upon any juror," whereas the federal rule allows a juror to testify "on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror." The practical effect of this difference is not altogether pellucid. See, e.g., United States v. Martinez-Moncivais, 14 F.3d 1030, 1036 n.3 (5th Cir. 1994); 27 CHARLES ALAN WRIGHT & VICTOR JAMES GOLD, FEDERAL PRACTICE & PROCEDURE § 6075 (1990).

to distinguish <u>Tanner</u> fails, and we cannot say that the state habeas court's application of Texas Rule 606(b) to bar testimony by the jurors concerning their internal discussion of parole law during deliberations was contrary to, or an unreasonable application of, clearly established federal law as determined by the Supreme Court.

The case most heavily relied upon by Salazar, <u>Turner v. Louisiana</u>, 379 U.S. 466 (1965), is of no avail to him. In <u>Turner</u>, the Supreme Court determined that the defendant's right to a fair trial by an impartial jury had been violated because two county deputy sheriffs, who were also key prosecution witnesses, were placed in charge of the jury. Throughout the trial, these deputies "freely mingled and conversed with the jurors in and out of the courthouse . . . ." <u>Turner</u>, 379 U.S. at 468. The Court concluded that this continuous contact violated the defendant's right to a fair trial by an impartial jury because the credibility of key prosecution witnesses had been improperly enhanced by their official association with the jurors during the trial. <u>Id.</u> at 473-74. Importantly, the admissibility of post-verdict juror testimony used to impeach a verdict was not an issue in <u>Turner</u>. The testimony supporting the claim of impropriety in that case came not from the jurors but from the

Regardless, Salazar has pointed to no clearly established Supreme Court law that would render TEX. R. EVID. 606(b) constitutionally infirm due to this difference. Rather, <u>Tanner</u> suggests that the Texas rule, at least as it was applied in this particular case, is constitutionally valid.

-39-

bailiffs, and the testimony was given during a mid-trial hearing on the defendant's motion for a mistrial, not after the verdict was rendered.  Id. at 468-70.  Moreover, Turner clearly did not involve internal jury deliberations but rather dealt with an external influence, i.e., the bailiffs' contact with the jurors during the trial, about which juror testimony would be admissible under the common-law exception discussed in Tanner.  Thus, the holding in Turner, which has never been applied by the Supreme Court to instances of the jury's internal discussions during deliberations, does not demonstrate that the state habeas court's decision was contrary to, or involved an unreasonable application of, clearly established Supreme Court precedent.[31]

Salazar also relies heavily on the Sixth Circuit's decision in Doan v. Brigano, 237 F.3d 722 (6th Cir. 2001), abrogation on other grounds recognized by Maples v. Stegall, 340 F.3d 433, 437

_____

[31]      More specifically, there is no indication from the Supreme Court that Turner applies to instances of a juror's statements to other jurors about parole law during deliberations, or that a jury's discussion of parole law runs counter to any constitutional principle.  If anything, what little the Supreme Court has said on the issue (or related issues) leans in the other direction.  Cf. Simmons v. South Carolina, 512 U.S. 154, 176 (1994) (O'Connor, J., concurring) ("In a State in which parole is available, the Constitution does not require (or preclude) jury consideration of that fact."); California v. Ramos, 463 U.S. 992, 997-1010 (1983) (indicating that a state court constitutionally may instruct, and a jury may consider during death-penalty sentencing, that the executive has the power to pardon a defendant sentenced to life in prison); see also Monroe, 951 F.2d at 52 ("The Supreme Court has indicated that a jury's consideration of executive clemency powers does not render a defendant's trial fundamentally unfair under the federal constitution." (citing Ramos, 463 U.S. 992)).

(6th Cir. 2003).  In Doan, a juror conducted an experiment in her own home during the trial to see if the defendant was telling the truth when he said he did not see a child's bruises on the evening of her death because of poor lighting.  Id. at 726-27. The juror related her findings, which she concluded had proved that the defendant was lying, to the other jurors.  Id.  The jury subsequently convicted the defendant of murder.  Id. at 726.  The state court denied relief on the defendant's claim that the juror's out-of-court experiment denied him his right to a fair and impartial trial on the ground that OHIO R. EVID. 606(b)[32] rendered the petitioner's evidence of jury misconduct inadmissible.  Id. at 727.  The federal district court denied his petition for habeas relief.  Id.  The Sixth Circuit, relying on Turner and Parker, held that the state court's adjudication of the defendant's constitutional claim was contrary to clearly established federal law because "[i]n the constitutional sense, trial by jury in a criminal case necessarily implies . . . that the evidence developed against a defendant shall come from the witness stand in a public courtroom where there is full judicial protection of the defendant's right of confrontation, of

---

[32]    The Ohio version of Rule 606(b) that was at issue in Doan differs from both FED. R. EVID. 606(b) and TEX. R. EVID. 606(b) in that, inter alia, it provides that "[a] juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear on any juror, only after some outside evidence of that act or event has been presented."  OHIO R. EVID. 606(b) (emphasis added).

cross-examination, and of counsel." Id. at 730-34. The court concluded that "Ohio Rule 606(B), by refusing to allow consideration of evidence of the improper juror experiment in this case, fails to protect adequately Doan's constitutional right to a fair trial" and that, therefore, "[t]he state court's use of this rule to decide Doan's constitutional claim is 'contrary to' clearly established Supreme Court precedent recognizing the fundamental importance of this right." Id. at 733. The Sixth Circuit, however, ultimately denied habeas relief because it found this constitutional violation to be harmless under Brecht v. Abrahamson, 507 U.S. 619 (1993). Id. at 736-38.

To state the obvious, Doan is not binding precedent on this court because it is an opinion of one of our sister circuits. For the same reason, but perhaps more important, Doan does not constitute clearly established federal law as determined by the Supreme Court, and, as such, it cannot provide the basis for habeas relief under § 2254. See, e.g., Williams, 529 U.S. at 412; Burgess, 350 F.3d at 469. Nevertheless, we note that the Sixth Circuit's conclusion in Doan is not inconsistent with our disposition of Salazar's habeas petition because Doan involved an out-of-court experiment conducted by a juror, not statements about parole law made internally by jurors during deliberations. In fact, the Doan court itself noted this critical distinction:

> It is important to stress that we are not calling Doan's verdict into question by reviewing the private, internal deliberations of the jury. As the Supreme Court has

-42-

noted, "substantial policy considerations," including the finality of verdicts and the avoidance of post-verdict juror harassment, weigh in favor of limiting the extent to which we delve into that thicket. Instead, what makes this case different, and what triggers concerns of a constitutional dimension, is the fact that Juror A conducted an out-of-court experiment and reported her findings to the jury in the manner of an expert witness. Unlike an expert witness, however, Juror A's testimony was not presented on the witness stand, nor was it subject to confrontation and cross-examination by Doan's attorneys. Juror A's testimony was not on the record, nor was it governed by the same evidence rules as all the other evidence presented at trial. In short, Juror A's experiment and her subsequent report of its results, results which indicated that Doan may not have been truthful in his testimony on the witness stand, injected extraneous and potentially prejudicial evidence into the jury's deliberations, evidence which Doan and his attorneys had no chance to refute.

Id. at 733 (internal citation omitted). Thus, Doan actually supports our conclusion that the state habeas court's adjudication of Salazar's claim was neither contrary to, nor an unreasonable application of, clearly established Supreme Court precedent.[33]

## III. CONCLUSION

Given the relevant Supreme Court precedents discussed above, we conclude the state habeas court's adjudication of Salazar's due process claim did not result in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court. "[T]he Constitution entitles a criminal defendant to a fair

---

[33] For similar reasons, Pyles v. Johnson, 136 F.3d 986 (5th Cir. 1998), a pre-AEDPA case addressing a juror's out-of-court experiment, does not support Salazar's claim.

trial, not a perfect one." Delaware v. Van Arsdall, 475 U.S. 673, 681 (1986). The state court in this particular case conducted a full hearing on the question, and it concluded that, in light of the conflicting evidence, Salazar failed to establish that he had been denied a fair and impartial trial. Regardless, the only evidence that Salazar presented in support of his claim of jury misconduct was the conflicting testimony of certain jurors that during deliberations one or more jurors may have made factually inaccurate statements about parole law. The state court's conclusion that this evidence was inadmissible under TEX. R. EVID. 606(b) was entirely consistent with the Supreme Court's holding in Tanner, which recognized the need to balance the defendant's interest in a post-verdict inquiry with the substantial interest in protecting the finality of judicial proceedings, full and frank discussions in the jury room, jurors' willingness to return an unpopular verdict, and the community's trust in the jury system. Accordingly, Salazar has not satisfied the standard set forth in § 2254, and we therefore AFFIRM the judgment of the district court denying his habeas petition.